[L.A. No. 32200. Oct. 29, 1987.]

ROBERT H. FUREY, JR., a Judge of the Justice Court, Petitioner,
v.
COMMISSION ON JUDICIAL PERFORMANCE, Respondent.

**COUNSEL**

Dennis A. Fischer for Petitioner.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, William R. Weisman, Patra Woolum and Susan D. Martynec, Deputy Attorneys General, for Respondent.

## OPINION

**THE COURT.** *—The Commission on Judicial Performance recommended that Judge Robert H. Furey, Jr., of the Catalina Justice Court District, Los Angeles County, be removed for "wilful misconduct in office" (hereafter wilful misconduct) and "conduct prejudicial to the administration of justice that brings the judicial office into disrepute" (prejudicial conduct). (Cal. Const., art. VI, § 18, subd. (c).) The judge petitions this court for review. (Cal. Rules of Court, rule 919.) As will appear, we adopt the recommendation.

The petitioner became a member of the State Bar in 1977. For somewhat over a year he engaged in private practice. Later he served as a deputy district attorney in Los Angeles County for approximately two years and then, again for about two years, as a deputy public defender.

Early in 1983 petitioner donned his judicial robe, having won election to the Justice Court of the Catalina Judicial District. The justice court on Santa Catalina Island (Catalina) is in session one day each week. By assignment of the Judicial Council, the judge spends the remainder of the week sitting in a variety of municipal courts on the mainland.

Responding to allegations of possible improprieties by petitioner, the Commission on Judicial Performance (Commission) conducted a preliminary investigation pursuant to rule 904 of the Rules of Court. It concluded that formal proceedings should be instituted and notified petitioner accordingly. (Cal. Const., art. VI, § 18; Cal. Rules of Court, rules 901-922.) The notice of formal proceedings charged petitioner with several acts of wilful misconduct, prejudicial conduct, and persistent failure or inability to perform his duties.

Subsequently, we appointed three special masters—all distinguished jurists, two retired, one active—to hear the evidence and report to the

---

*Before Lucas, C. J., Mosk, J., Broussard, J., Panelli, J., Arguelles, J., Kaufman, J., and Low (Harry W.), J.†

†Presiding Justice, Court of Appeal, First District, Division Five, assigned by the Chairperson of the Judicial Council.

Commission. (Cal. Rules of Court, rule 907.) After 11 days of hearings, the masters announced their findings of fact and conclusions of law. Petitioner filed objections to the masters' report and presented his views to the Commission. After adopting the substance of the report, the Commission, by a vote of seven to one, recommended to us that petitioner be removed from office.

In his petition to review the recommendation the judge does not, for the most part, dispute its factual underpinnings. Rather, he maintains that the actions complained of lacked malice and thus constitute at most the lesser charge of prejudicial conduct. He further contends that in any event removal from office is too severe a penalty for what he characterizes as no more than "serious procedural shortcomings."

## I. STANDARD OF REVIEW

■ As is our duty, we independently review the findings of the Commission to ensure that there is clear and convincing evidence to sustain the charge to a reasonable certainty. (*Gonzalez v. Commission on Judicial Performance* (1983) 33 Cal.3d 359, 365 [188 Cal.Rptr. 880, 657 P.2d 372 ]; *Geiler v. Commission on Judicial Qualifications* (1973) 10 Cal.3d 270, 275 [110 Cal.Rptr. 201, 515 P.2d 1].) We do, however, give special weight to the factual determinations by the masters, who are best able to evaluate the truthfulness of witnesses appearing before them. (*Gubler v. Commission on Judicial Performance* (1984) 37 Cal.3d 27, 34 [207 Cal.Rptr. 171, 688 P.2d 551]; *Wenger v. Commission on Judicial Performance* (1981) 29 Cal.3d 615, 623 [175 Cal.Rptr. 420, 630 P.2d 954].)

■ A judge's behavior must constantly reaffirm fitness for the serious responsibilities of judicial office. (*Geiler, supra,* 10 Cal.3d at p. 281.) Censure or removal from office is appropriate only when the judge fails to meet this standard by engaging in wilful misconduct or prejudicial conduct. ■ The charge of wilful misconduct refers to "unjudicial conduct which a judge acting in his judicial capacity commits in bad faith." (*Id.* at p. 284.) ■ The lesser charge of prejudicial conduct comprises that which the judge undertakes in good faith but which would nonetheless appear to an objective observer to be unjudicial and harmful to the public esteem of the judiciary. It also refers to unjudicial conduct committed in bad faith by a judge not acting in an official capacity. (*Geiler, supra,* 10 Cal.3d at p. 284 & fn. 11; *Gonzalez, supra,* 33 Cal.3d at p. 365.)

■ The critical distinction between wilful misconduct and prejudicial conduct is the presence of malice. Before reviewing the charged incidents of misconduct we must consider petitioner's contention that the masters and

the Commission applied an incorrect definition of this state of mind. The report of the masters, adopted in substantially unchanged form by the Commission, refers to bad faith as "the intentional commission of acts which the judge knew or should have known were beyond his lawful power, engaging in a pervasive course of conduct of overreaching his authority." (*McCartney* v. *Commission on Judicial Qualifications* (1974) 12 Cal.3d 512, 531 [116 Cal.Rptr. 260, 526 P.2d 268]; *Geiler, supra,* 10 Cal.3d at p. 286.) A similar standard is articulated in *Gonzalez,* which declares that bad faith is "equivalent to actual malice and encompasses the intentional commission of acts which the judge knew or reasonably should have known were beyond his lawful power, as well as acts which though within the ambit of lawful judicial authority are committed for purposes other than the faithful discharge of judicial duties." (*Gonzalez, supra,* 33 Cal.3d at p. 365.) Admittedly, these cases might be understood as suggesting that malice for purposes of judicial discipline is solely a question of the judge's actual or constructive knowledge of the scope of his authority.

Other cases make it plain, however, that in the present context malice includes a second element: improper purpose. Our recent opinion in *Gubler, supra,* 37 Cal.3d at page 46, footnote 7, specifically rejected the single-pronged standard applied by the masters and Commission in the case at bar. We there observed that bad faith requires a "malicious or corrupt purpose beyond mere actual or constructive knowledge of lack of power." (*Id.* at p. 59.) In *Wenger, supra,* 29 Cal.3d at page 622, footnote 4, we made this two-pronged standard even more explicit by defining bad faith as requiring that the judge "(1) committed acts he knew or should have known to be beyond his power, (2) for a purpose other than faithful discharge of judicial duties." We reaffirm the latter test.

## II. CHARGED INSTANCES OF MISCONDUCT

Applying the above standards, we evaluate the various incidents found by the masters and the Commission to constitute wilful misconduct or prejudicial conduct.[1]

*The Hatton Incident*

█ On February 10, 1983, petitioner presided over a proceeding involving Autry Lee Hatton, who, a year previously, had been convicted of

---

[1] Count I in the notice of formal proceedings alleged various charges of wilful misconduct and count II instances of prejudicial conduct, often arising out of the same incident. For ease of reference we have organized the discussion by incident rather than by count or specific charge of wrongdoing. In addition, count III accused petitioner of persistent failure or inability to perform the judge's duties. This is a lesser charge as to which the masters made no findings; we do not further consider it here.

vehicular manslaughter and sentenced by another judge to summary probation for two years on the condition that he complete five hundred hours of community service during the first year. Hatton, who was to account for his community service, attempted to explain to petitioner that he had a medical appointment and was in pain, but petitioner interrupted him, directing him to return in the afternoon with his attorney. He further warned the defendant that if he had to tell him one more time, he would find him in contempt. Hatton replied "All right. I don't know why you are harassing me." Petitioner immediately held him in contempt of court for his utterance and remanded him "right now."

The matter was trailed into the afternoon, at which time counsel appeared on behalf of defendant Hatton. Counsel objected to petitioner's order that the matter be put over to the following day and requested him to set bail, arguing that the defendant was experiencing health problems and had a medical appointment for that day, that he was in any event eligible for release on his own recognizance, and that he had never failed to appear in the past. Petitioner set bail and ordered Hatton to remain in custody and to be medically examined at the county jail forthwith.

The following day petitioner purged Hatton's contempt following an apology for the incident. He then observed that his sentence seemed very lenient in view of the seriousness of the crime, and he noted that Hatton had apparently performed only about half of the required 500 hours of community service. After his counsel described the defendant's medical condition, petitioner—on the recommendation of the deputy city attorney—summarily revoked probation and set a formal probation violation hearing for the following month.

Petitioner presided over the probation hearing, which occurred despite defense counsel's objection that there was no written notice of the claimed violation. Although Hatton had a note from a doctor outlining his medical condition, petitioner chided him for his alleged failure to obey his earlier order to "come in with something more than a perfunctory letter from the doctor" and had him remanded to the county jail for 180 days. The appellate department of the superior court subsequently reversed the order revoking probation and the jail sentence, directing the municipal court to terminate all proceedings against Hatton.

Petitioner was charged with wilful misconduct for abuse of the contempt power, denying the defendant his full right to be heard according to law, failure to conduct himself in court proceedings in a manner that promotes public confidence in the impartiality of the judiciary, and engaging in a vengeful and punitive pattern of conduct toward the defendant. He was also

charged with prejudicial conduct in acting with unwarranted impatience, discourtesy, or hostility toward an unrepresented defendant.

The masters made no finding on the charge of vengeful and punitive conduct or on the alleged denial of the defendant's right to be heard. They concluded that the charge of prejudicial conduct for impatience or hostility toward an unrepresented defendant was true. But considering the mere one or two months that petitioner had occupied his office at the time of the incident and his understandable reliance on the representations of an experienced prosecutor, they determined that his behavior in the remaining matters (abuse of the contempt power and failure to conduct himself in a manner that promotes public confidence in the impartiality of the judiciary) was not sufficiently aggravated to constitute wilful misconduct, but was merely prejudicial conduct.

Petitioner has stipulated to the material facts of this incident and does not contest that his actions were prejudicial to the administration of justice. In any event we are persuaded that clear and convincing evidence supports the Commission's findings of fact on the point.

■ We note, however, that there is considerable overlap in the three findings of prejudicial conduct. Obviously, actions such as these cannot be equated with the criminal law, in which each additional accusation exposes the defendant to increased punishment. Nonetheless, although there is no rigid formula for determining the proper outcome in a case alleging judicial impropriety, the number and quality of the charges found to be true assumes importance as one of the guidelines we apply in making the difficult decision of discipline. (*Wenger, supra,* 29 Cal.3d at p. 653; see also *Gonzalez, supra,* 33 Cal.3d at p. 377.) Duplicative findings should for that reason be avoided. The charges of abuse of the contempt power, as well as impatience and hostility toward Hatton, are two related but conceptually distinct allegations of prejudicial conduct that have properly been found true. But the charge that petitioner failed to conduct himself in a manner promoting public confidence in the judiciary, although supported by the facts, appears to focus on the same misconduct that underlies the other two allegations, and we therefore dismiss it.[2]

*The Kabbaze Incident*

■ While petitioner was presiding in the Los Angeles County Municipal Court, Anthony Kabbaze appeared before him in propria persona to

---

[2] We do not wish to intimate that we object to the *bringing* of potentially overlapping charges; obviously, the Commission may make any charges justified by the evidence. But because the disposition of a case depends in large measure on the nature and number of charges found to be true, we should not consider overlapping findings in reaching our decision, nor should the Commission take them into account in making its recommendation.

request more time to pay a traffic fine. Another judge had previously imposed on him a sentence of $300 or 10 days in prison. Petitioner refused the request, telling him "it is $300 or 10 days today." Kabbaze pointed out that others in the court were obtaining continuances, but petitioner warned him to say nothing further and remanded him to serve the 10 days. As Kabbaze was being directed toward the lockup, he muttered the word "tremendous" under his breath. Petitioner immediately adjudged him to be in contempt of court and sentenced him to five days in jail. Kabbaze then articulated a long voiceless palatal fricative ("shhh") that petitioner believed was followed by "it"; he again held Kabbaze in contempt and imposed another sentence of five days. Later that day a deputy public defender interceded on his behalf and persuaded petitioner, on Kabbaze's apology, to purge the contempt and grant him a continuance to pay the balance of the fine.

The record supports the masters' conclusion that the above events are true. They further resolved that the charge of abuse of the contempt power as well as that of impatience and hostility toward an unrepresented defendant constituted merely prejudicial conduct in these circumstances. It is undisputed that petitioner did not follow the mandated contempt procedure (Code Civ. Proc., § 1211) and acted unjudiciously toward Kabbaze. But petitioner testified that he acted solely to maintain control of the crowded courtroom and that he did not intend that Kabbaze remain in custody beyond that afternoon. We note also that he had then been on the bench for less than half a year, and we therefore adopt the conclusion of the masters and the Commission that this incident reflects merely two charges of prejudicial conduct.

*The Hughes Incident*

■ Defendant Bradley Hughes appeared before petitioner on Catalina and filed a motion to disqualify him under Code of Civil Procedure section 170.6. Petitioner ordered the case transferred to San Pedro. He then wrote an unbidden note to the judge of that court, advising him the "standard" sentence for the violation in question was $100 or three days in jail, but that he recommended a stiffer sentence on account of Hughes's alleged bad attitude.

The notice of formal proceedings included two charges of wilful misconduct arising out of this episode: offering unsolicited advice to another judge on a case from which he had been disqualified, and vengeful and punitive conduct. We dismiss the latter because it appears in this case merely to specify his motivation in the giving of the advice, thus duplicating the focus of the former charge.

The allegation of giving unsolicited advice is amply confirmed in the record. The masters found that the communication was for a vindictive and punitive purpose in view of the fact that petitioner was disqualified and had earlier placed Hughes in custody for inability to post bail on the offense; this would support a finding that he acted with malice and that sending the note thus constituted wilful misconduct. Despite the obvious and grave impropriety of petitioner's action, the masters and Commission legitimately concluded that in light of petitioner's inexperience and his admission soon afterwards that his action was wrong, he engaged only in prejudicial conduct.

*The Hamilton Incident*

■ Petitioner was presiding in the Los Angeles Municipal Court when John Hamilton appeared before him to discuss his inability to pay a fine. Petitioner had presided over his trial for failure, as a pedestrian, to yield the right of way to a vehicle. He knew that Hamilton was indigent and possibly mentally imbalanced. He also believed, on the basis of reports of prior incidents in the courthouse, that he was potentially violent. He thus ordered that Hamilton's bag (which was out of his reach) be searched. This revealed some food and a small paring knife with a thin serrated blade measuring barely four and one-quarter inches. Petitioner promptly found Hamilton in violation of Penal Code section 171b, which prohibits bringing into a courtroom a knife with a blade in excess of four inches, and had him remanded, setting bail at $10,000.

That afternoon, on petitioner's initiative, a deputy public defender appeared with Hamilton. Petitioner found Hamilton in contempt for entering the courtroom with a knife and sentenced him to five days in jail. He further ordered a mental evaluation under Penal Code section 4011.6. When the deputy public defender objected to the examination, petitioner imposed on Hamilton a $500 fine, to be served at the rate of $30 per day, while continuing to insist on a mental evaluation. Hamilton reacted by informing petitioner that he was "out of order" and "schizophrenic," and that he, Hamilton, was "God" and "part heir of the Giannini family." Petitioner found him guilty of two more counts of contempt, each of which was punished by a consecutive sentence of an additional five days, plus fines of $500 for each count, to be served at the rate of $30 per day. The punishment thus amounted to 15 days in jail and a total fine of $1,500. The superior court subsequently granted Hamilton's petition for a writ of habeas corpus.

The Commission charged petitioner with abuse of the contempt power (wilful misconduct) and unwarranted impatience, discourtesy and hostility towards an unrepresented defendant (prejudicial conduct). The masters and

the Commission concluded that petitioner's fears arising out of reports of a prior knife incident, as corroborated by the bailiff, mitigated petitioner's conduct, and they therefore found only prejudicial conduct.

We agree that the actions at the very least reflect conduct prejudicial to the administration of justice. Remanding Hamilton to custody initially could not be justified for failure to pay the fine for the underlying infraction nor was it appropriate as punishment for contempt for having a knife in the courtroom in the absence of written findings and an order. Indeed, the search of a bag on the basis of rumors regarding an earlier incident was itself questionable, as was petitioner's overreaction to a small paring knife that was in any event beyond the defendant's reach. (Cf. *In re Jasper* (1973) 30 Cal.App.3d 985 [106 Cal.Rptr. 754].)

Even more troubling is the fact that when the deputy public defender later questioned the order for a mental observation because the examination might not be possible within the five-day period of incarceration, petitioner imposed a fine of $500, to be served at $30 per day, in addition to the original sentence of five days in jail. The transcript reveals that petitioner was aware that Hamilton was indigent and would be compelled to work the fine off at the daily rate. He thus increased the penalty for contempt far beyond the five days permitted by law (Code Civ. Proc., § 1218; *In re Antazo* (1970) 3 Cal.3d 100 [89 Cal.Rptr. 255, 473 P.2d 999]) to an effective period of incarceration of some 22 days simply to ensure that Hamilton would be held in jail long enough for a mental examination.

The ensuing two contempt counts, triggered by Hamilton's delusional remarks, suffer from all the shortcomings of the foregoing but are further defective because they impose consecutive sentences for a single course of conduct. (See, e.g., *In re Keller* (1975) 49 Cal.App.3d 663 [123 Cal.Rptr. 223].) The result is that a mentally disturbed, indigent defendant—who had the misfortune to have a small paring knife in his bag while requesting an extension of time to pay a $50 fine for jaywalking—was effectively sentenced by petitioner to approximately 65 days in jail. There is little doubt that Hamilton may have been unstable and in need of treatment, but these punitive measures bear virtually no relation to his almost trivial offense and his obvious need for care.

*The Anderson Incident*

On February 14, 1984, petitioner was assigned to hear traffic infraction cases in the South Bay Judicial District. Upon taking the bench he made some preliminary remarks and then announced to the assembled defendants that if there was a discrepancy between their version of the facts

and that of a police officer, he would always believe the latter because perjury was a felony and a policeman would not jeopardize his career over such an insignificant matter.

Defendant Anderson appeared in propria persona to contest a traffic citation. A police officer testified for the prosecution. During his defense, Anderson commenced reading a Vehicle Code section. Petitioner, cut him short and found him guilty, imposing a fine and penalty assessment. The appellate department of the superior court later reversed the judgment because Anderson had been denied an opportunity to cross-examine the police officer and to make a closing argument.

The masters' conclusion, adopted by the Commission, was that petitioner's announcement to the assembled defendants constituted wilful misconduct, i.e., failure to conduct himself in a manner that promotes public confidence in the impartiality of the judiciary. Also found to be wilful misconduct was his denial of a defendant's right to be heard by preventing him from cross-examining the witness against him and making a closing argument. We note that both aspects of the incident interfered with fundamental precepts of our judicial system. In fact, petitioner does not dispute that he was or should have been aware that such actions would be highly improper. As both a former deputy district attorney and a former deputy public defender he could scarcely have avoided being intimately familiar with the presumption of innocence and the right of an accused to cross-examine the witnesses against him.

Thus the only issue is whether the second prong of the definition of malice is met. As noted above, there must be "clear and convincing evidence" that his purpose was "malicious or corrupt." (*Gubler,* supra, 37 Cal.3d at p. 59.) The Commission contends that his corrupt purpose was to coerce guilty pleas and thereby expedite the calendar. We therefore defer to its finding and conclude that petitioner was guilty of wilful misconduct.

*The Cuskaden Incidents*

 Several charges of misconduct relate to a Ms. Cuskaden, who resided on Catalina during much of the time during which petitioner occupied the bench on the island and was well known in the courtroom, both as litigant and spectator.

1. *August 19, 1983*

In mid-August 1983 petitioner became aware of a letter that Ms. Cuskaden wrote to the Commission in which she alleged that he had her evicted

from the courtroom and had ordered the bailiff, in doing so, to punch her in the mouth. There is evidence in the record that she posted these charges in various public places in Avalon. Petitioner wrote to Ms. Cuskaden and directed her to appear before him on August 19.[3] On that date he inquired of her whether the letter to the Commission bore her signature. When she invoked her right to remain silent, petitioner ordered her to appear in the Long Beach Municipal Court to show cause why she should not be held in contempt for the language in her letter to the Commission. He further informed her that if she were adjudged in contempt and remanded to custody, he would recommend a mental evaluation of her pursuant to Penal Code section 4011.6. Finally, unless she came as a party or a witness, he would hold her in contempt if she again appeared in his courtroom.

On the basis of the report of the masters, the Commission found two charges of wilful misconduct to be true: that petitioner had abused the contempt power and that he had failed to conduct himself in a manner promoting public confidence in the judiciary. It concluded that the acts involved malice in that he "intentionally committed acts which he knew or should have known were beyond his lawful power," engaging in a "pervasive course of conduct of overreaching his authority." (*Geiler*, supra, 10 Cal.3d at p. 286; see also *McCartney*, supra, 12 Cal.3d at p. 531.)

The Commission's findings are fully justified. Petitioner once again failed to follow the contempt procedures mandated in Code of Civil Procedure section 1211. Furthermore, petitioner should have known that his actions would undermine public confidence in the impartiality of the judiciary. His summoning Ms. Cuskaden into court at the very least suggests the appearance of singling her out to punish her for complaints about him to the Commission.

In addition, the conduct exhibited malice. Petitioner claims that he simply intended to ask her to retract the defamatory imputations of the posted letter.[4] Even if this explanation is true, the matter should have been handled by a judge who was not personally embroiled in it. (See *Wenger*, supra, 29 Cal.3d at p. 629.) And the masters characterized his actions as "vindictive" and "punitive." It stretches credulity to claim that summoning someone

[3] Ms. Cuskaden appears also to have posted copies of the letter from petitioner, adding to it her annotations. Beneath his signature she wrote that the judge was trying to "extradite" her from the island, stated that he had her thrown out of the courtroom and had his bailiff punch her, and reported that details were to be found in her new novel, "From House Shoes to Hand Grenades." She invited the community to come to the August 19 proceeding.

[4] His explanation is belied by his stipulation in lieu of testimony, which states that petitioner ordered Ms. Cuskaden to appear in Long Beach to show cause why she should not be held in contempt for the language of her letter. There is no mention of an intended request for a retraction.

into court and initiating a contempt proceeding for writing a letter to the Commission could be done for a proper judicial purpose.

In relation to this incident petitioner was also charged with wilful misconduct for engaging in a vengeful and punitive pattern of conduct by improperly summoning Ms. Cuskaden to appear before him and later attempting to banish her from his courtroom. The Commission adopted the finding of the masters that these charges constituted only prejudicial conduct. Because they largely duplicate the two charges of wilful misconduct that we have concluded are true, we lay aside these findings.

2. *Incident of September 23, 1983*

Petitioner again summoned Ms. Cuskaden into his courtroom by a letter dated September 15, 1983. When she appeared eight days later, she attempted to disqualify him by a motion pursuant to Code of Civil Procedure section 170.6. Petitioner denied the motion as inappropriate in a contempt hearing. A peace officer then testified that he had seen Ms. Cuskaden in line to board the ferry from the island to Long Beach at approximately 11:15 a.m. on September 12. Petitioner held Ms. Cuskaden in contempt for violating his order to appear at 9 a.m. that same day in Long Beach in connection with her letter to the Commission and the material she had posted in Avalon. He sentenced her to five days in jail and a fine of $500, which could be served at the rate of $30 a day. She was remanded forthwith.

Ms. Cuskaden was brought back to petitioner's courtroom that afternoon. He had learned that her teenage son might be living alone in a motel in Avalon. A local ordinance made it an offense to allow a motel room to be occupied solely by someone under the age of 18. When he questioned her about her son's age and residence, she invoked her right to remain silent. Petitioner forthwith held her in contempt and sentenced her to an additional $500 fine and five more days in jail. On September 28 the Los Angeles Superior Court released Ms. Cuskaden on a writ of habeas corpus, and the following month it ruled the contempt orders fatally defective because the timely order required by Code of Civil Procedure section 1211 had not been filed.

The Commission concluded this series of events constituted abuse of the contempt power, failure to conduct himself in court proceedings in a manner that promotes public confidence in the impartiality of the judiciary, and vindictive and punitive conduct in improperly questioning and jailing Ms. Cuskaden regarding an uncharged collateral matter over her timely invocation of the constitutional right to remain silent. The Commission further

found that the vindictive and punitive conduct in improperly summoning Ms. Cuskaden was prejudicial conduct.

The evidence once again supports these conclusions. Petitioner knew or should have known that his actions exceeded the bounds of his authority. The contempt orders were, as in the other instances, procedurally irregular. Furthermore, the masters found that Ms. Cuskaden had indeed appeared before Judge Simpson in the Long Beach Municipal Court on the day in question, and that the case was continued to September 26 for a hearing. Ironically, in his eagerness to ensure her presence in Long Beach, petitioner appears to have held her in contempt despite the fact that she went to the hearing on the appointed day, and by having her jailed for 10 days for the 2 alleged contempts on September 23 he prevented her from attending the continued contempt hearing in Long Beach on September 26.

Equally disturbing is petitioner's ordering her into his courtroom later to question her about her son's occupancy of a motel room and the addition of another count of contempt when she refused to testify on a matter over which he palpably had no jurisdiction. Finally, the imposition of fines that were sure in her case to lead to additional jail time violates the precepts of *In re Antazo, supra,* 3 Cal.3d at page 115.

 In contempt proceedings the court is often the prosecutor, judge, and jury. The contempt power is virtually unique in our system of justice because it permits a single official to deprive a citizen of his fundamental liberty interest without all of the procedural safeguards normally accompanying such a deprivation. Petitioner would have done well to recall the words of one of this court's first opinions, a case involving the future Justice Stephen J. Field: "The power [of contempt] is necessarily of an arbitrary nature, and should be used with great prudence and caution. A Judge should bear in mind that he is engaged, not so much in vindicating his own character, as in promoting the respect due to the administration of the laws . . . ." (*People* v. *Turner* (1850) 1 Cal. 152, 153.)

 We must, in determining whether malice existed, also assess petitioner's purpose. He suggests that summoning Ms. Cuskaden into court was a well-meaning attempt to teach her that there was no future in disobeying lawful orders of the court. The masters, however, once again found that petitioner had engaged in vindictive and punitive conduct. His eagerness to compel that Ms. Cuskaden be made to account for her letter criticizing him to the Commission and the inquisitorial proceeding regarding her son—who would be living alone only because his mother was wrongfully held in jail—support a strong inference that his motive was to punish her and perhaps to

drive her off the island. We therefore adopt the Commission's findings on this incident.

### 3. *The Letter to Judge Herrington*

On March 28, 1984, Ms. Cuskaden appeared as a defendant in the Catalina Justice Court. She filed an affidavit of prejudice against petitioner under Code of Civil Procedure section 170.6. The case was then transferred to the South Bay Judicial District.

Petitioner subsequently wrote a letter to Judge Herrington of the latter court, advising her that the Cuskaden case would likely be heard in her division. The note continued that "since I have been papered, it goes without saying that I must use discretion and not attempt to influence you or any other judge." Ms. Cuskaden, he nevertheless reported, had recently been convicted by an Avalon jury but it was no longer possible to impanel an impartial group of jurors on the island. Furthermore, he warned Judge Herrington that "any statements made by this defendant should be viewed with skepticism. On at least two occasions, this defendant has libeled my bailiff and myself. . . . [H]er ability to distort and/or lie can be most persuasive."

The notice of formal proceedings contained two charges of wilful misconduct arising out of this occurrence: offering unsolicited advice to another judge on a case from which he had been disqualified, and vengeful and punitive conduct. Although the two charges focus on different aspects of the writing of the letter, they overlap considerably. We therefore adopt only one of the Commission's findings: that offering unsolicited advice to another judge constituted wilful misconduct. As we observed in *Gubler, supra,* 37 Cal.3d at page 54, "Since petitioner was disqualified under section 170.6 from hearing the . . . issue, it was highly improper for him to give unsolicited advice to another judicial officer on how to decide it. The right to disqualify a judge, guaranteed by section 170.6 [citations], would be undermined and perhaps vitiated if the disqualified judge were permitted to circumvent the disqualification by initiating advice to another judicial officer on how to decide the matter."

The masters observed that although in the similar Hughes incident they had found the rendering of unsolicited advice to be the lesser charge of prejudicial conduct owing to petitioner's contrition and lack of experience, in the present instance he not only should have known, but obviously was

actually aware, that his action was highly improper.[5] Petitioner does not dispute this finding. But he contends that his motivation was merely to warn Judge Herrington and protect the court from possible misrepresentation. The masters, to whom we customarily defer in questions of the credibility of witnesses, characterized his explanation as "disingenuous" and stated that the gratuitous transmission of his views to Judge Herrington following his disqualification was done for vindictive and punitive motives. (Cf. *Gubler, supra,* 37 Cal.3d at pp. 52-54.) We agree. Indeed, petitioner virtually condemned himself by acknowledging in his letter the need to avoid influencing another judge and then proceeding to do exactly that.

### 4. *The Dress Code Violation*

■ Posted in the Catalina courtroom was a sign with the following text: "Notice!! All parties and witnesses appearing before the court will be properly attired. Long pants and shirt. No shorts, swim suits or bare feet allowed in court room at any time." This is understandable in a resort community.

On June 15, 1984, Ms. Cuskaden entered the court as a spectator, wearing shoes, jeans, and a sweatshirt that left a shoulder bare, revealing the strap of a piece of underclothing or a bathing suit. Before court was in session, petitioner asked his bailiff to inform her that she was improperly attired and would have to leave. She declined to do so. Petitioner then took the bench and told her that she was in violation of the dress code. When she refused to leave, he held her in contempt of court and sentenced her to five days in jail and a $500 fine. She was transported to a division of the Los Angeles County Jail on the mainland, only to be released on her own recognizance later that day after she petitioned the superior court for a writ of habeas corpus. A month later the superior court granted the petition and vacated the contempt order.

Following his adjudication that Ms. Cuskaden was in contempt, petitioner ordered that she not be allowed to make a telephone call. He contends that as she was being led out of the courtroom she shouted that she wished to make a call, and that he issued the prohibition because he interpreted her utterance as a request to use the telephone on the court clerk's desk. However, we are inclined to agree with the masters who found that petitioner meant to preclude her from making *any* telephone calls. It is clear that this interpretation was given petitioner's utterance by his bailiff, who wrote on the booking slip that "Judge orders no phone calls." Because the bailiff was

---

[5] Soon after the earlier Hughes incident, petitioner had met with two deputy public defenders, admitted that sending the letter had been improper, and promised not to do so again.

at the scene and had worked with petitioner for some time, his contemporaneous understanding of the meaning of the statement should be given substantial weight.

The Commission based two charges of wilful misconduct on this incident: abuse of the contempt power and failure to conduct himself in a manner that promotes public confidence in the impartiality of the judiciary. We concur in its conclusion that the evidence substantiates the charges. As to the contempt power, petitioner again failed to make the required written findings and an order. He seems to have learned nothing from the fact that several of his contempt orders had been set aside by higher courts for these procedural defects.[6] And once more he imposed a monetary fine on an indigent, ordering confinement if it was not paid and thus effectively quadrupling the permissible period of confinement. Furthermore, petitioner violated Ms. Cuskaden's statutory right to use the telephone (Pen. Code, § 851.5, subd. (a)), thereby jeopardizing her ability to obtain relief by a petition for habeas corpus. Singling her out for such treatment clearly does not serve to promote public confidence in the impartiality of the judiciary.

Moreover, we have seen ample confirmation of petitioner's growing animosity toward Ms. Cuskaden. These incidents do not merely reflect "procedural shortcomings," as he would have it, but are part of a disturbing pattern of wilful misconduct toward a litigant and courtroom spectator. As the masters noted, he was probably dealing with Ms. Cuskaden in a manner applauded by those who believe her to be a controversial and difficult individual. But a judge's prime responsibility is the evenhanded dispensation of justice, even for the controversial and difficult persons in society. We thus conclude that in indulging his animosity toward Ms. Cuskaden petitioner was guilty of wilful misconduct in office.

### III. DISPOSITION

We have seen that the Commission, by a vote of seven to one, recommended that petitioner be removed from office. While we give serious consideration to the recommendation and its near-unanimity, the ultimate disposition rests with this court. (*Spruance* v. *Commission on Judicial Qua-*

---

[6] Whether Ms. Cuskaden was truly in contempt is not clear because of this failure to make findings. If she was cited for her dress, the contempt was improper because the sign was not directed at spectators. On the other hand, petitioner maintains that the masters misconstrued the order and that Ms. Cuskaden was held in contempt for her refusal to obey the order to leave and her use of vulgar language in the courtroom. But he stipulated earlier that he "found her in contempt of his order setting forth the dress code." Furthermore, his bailiff testified that "she didn't go into profanity this time." Petitioner therefore cannot now argue that the facts were otherwise, especially because he is himself responsible for the lack of findings.

*lifications* (1975) 13 Cal.3d 778, 799-800 & fn. 18 [119 Cal.Rptr. 841, 532 P.2d 1209].)

■ We have sustained eight charges of wilful misconduct against petitioner, arising out of four separate incidents. In addition, we have sustained 10 charges of prejudicial conduct. ■ Choosing the proper sanction is an art, not a science, and turns on the facts of the case at bar. ■ Nevertheless, it is worth comparing the charges sustained here with those in other judicial discipline cases.

Since 1964 this court has ordered the removal of five judges. The first such case was *Geiler, supra,* 10 Cal.3d 270, in which a judge was removed for several instances of wilful misconduct, including the use of vulgar language and sexual innuendo, prodding a deputy public defender with a dildo, curtailing cross-examination, and interfering with the attorney-client relationship. In *Spruance, supra,* 13 Cal.3d 778, a judge was removed from office for acting with hostility toward an attorney by failing to properly disqualify himself, maliciously attempting to prejudice a criminal defendant's case, trying to influence the disposition of criminal cases as a favor to friends and political supporters, and appointing friends and supporters as attorneys in cases in which the defendant was not entitled to counsel at public expense. We concluded in *Cannon* v. *Commission on Judicial Qualifications* (1975) 14 Cal.3d 678, 681 [122 Cal.Rptr. 778, 537 P.2d 898], that the petitioner had engaged in 21 acts constituting wilful misconduct and 8 instances of prejudicial conduct. Among the former were cases of abuse of the contempt power, unlawful interference with the attorney-client relationship, arbitrary setting of bail, instilling submissiveness in attorneys and ridiculing members of the bar, abusing the prerogatives of office, and several instances of bizarre behavior.

The next case in which a judge was removed was *Wenger, supra,* 29 Cal.3d 615. There we sustained 10 charges of wilful misconduct in 9 separate incidents. The wilful misconduct included failure of the judge to disqualify himself, abuse of the contempt power, and banishing a prosecutor from the courtroom because he suspected she had communicated with the Commission regarding his judicial performance. Finally, our sustaining of 18 charges of wilful misconduct and 2 charges of prejudicial conduct led to removal in *Gonzalez, supra,* 33 Cal.3d 359, 377. Among the incidents of wilful misconduct were interceding in criminal matters for the benefit of friends and benefactors, arbitrary bail-setting, impugning the character of his colleagues, abuse of judicial authority, making personal verbal attacks, and uttering ethnic and sexual slurs.

Petitioner's transgressions are not as numerous or as colorful as those in *Cannon,* for example, which is admittedly a rather egregious illustration of judicial malfeasance. His case exhibits many similarities with *Wenger,* however, both as to the number of sustained charges of wilful misconduct and the types of incidents. In both this case and *Wenger* the primary instances of misconduct consisted of abuses of the contempt power, failure of the judges to disqualify themselves, and by various means improperly injecting themselves into the adversarial process. And in each case the judge took reprisals against someone he knew or suspected had complained of his conduct to the Commission.

Petitioner concedes that some discipline is appropriate. But he maintains that the confluence of his inexperience on the bench and unusually trying circumstances mitigates his conduct. Several witnesses praised his energy and devotion. He further alleges that before the recommendation of sanctions by the Commission he became aware of his shortcomings and began attending judicial education meetings.

We have no doubt that petitioner was industrious, but hard work does not mitigate wilful misconduct. (*Wenger, supra,* 29 Cal.3d at p. 653.) As we stated in *Cannon, supra,* 14 Cal.3d at page 706, "It is manifest . . . that a lack in the quality of justice cannot be balanced by the fact that justice, such as it is, is administered in large quantities." Nor are petitioner's expressions of remorse especially persuasive. As in *Wenger,* "The difficulty with his professed enlightenment is its delayed arrival." (*Wenger, supra,* 29 Cal.3d at p. 654.) All the sustained charges of wilful misconduct occurred after he became aware that Ms. Cuskaden had been in contact with the Commission, and hence after he should have been on notice that an investigation of his conduct was possible. And he seems to have learned little from his mistakes: he improperly held Ms. Cuskaden in contempt after similar orders had twice been overturned by a higher court for procedural irregularities, and he sent an unsolicited letter to Judge Herrington even after he had been warned of its impropriety in the Hughes incident.

Petitioner urges leniency because of his inexperience. Here again an analogy with *Wenger* is apposite. Judge Wenger had been a deputy district attorney for five years and had been in office a mere three years before the Commission notified him that it was investigating his conduct; the Commission filed its recommendation for removal only five years after he took office. We rejected Judge Wenger's appeals to inexperience, noting that he should have known criminal procedure and that his abuses in civil matters were too serious to be explainable by lack of training. (*Wenger, supra,* 29 Cal.3d at pp. 653-654.) Like Judge Wenger, petitioner had been an attorney for five years, largely as a deputy district attorney and deputy public defend-

er, before assuming the bench. And in both cases the misconduct occurred during the first few years that the judges were in office. In any event, lack of prior experience simply cannot mitigate wilful misconduct: if petitioner did not have the legal background and temperament to avoid committing malfeasance in office, he should not have sought election to the court.

We recognize that all the sustained charges of wilful misconduct involved Ms. Cuskaden, a person described in the record as a foulmouthed and intentionally disruptive spectator and litigant. But the mitigating weight of Ms. Cuskaden's courtroom demeanor is slight. (Cf. *Wenger, supra,* 29 Cal.3d at p. 637.) It was petitioner's duty to deal with such difficulties by lawful and proper means. As Justice Douglas of the United States Supreme Court has written, "Judges are supposed to be men of fortitude, able to thrive in a hardy climate." (*Craig* v. *Harney* (1947) 331 U.S. 367, 376 [91 L.Ed. 1546, 1552, 67 S.Ct. 1249].)

 Finally, petitioner suggests that instead of removal we order a temporary suspension from office, a sanction that has been applied in some of our sister states. (Cf. *Matter of Inquiry Concerning a Judge No. 693* (1984) 253 Ga. 485 [321 S.E.2d 743]; *Matter of Martinez* (1982) 99 N.M. 198 [656 P.2d 861]; *Matter of Hague* (1982) 412 Mich. 532 [315 N.W.2d 524]; *Matter of Ross* (Me. 1981) 428 A.2d 858.) We possess no such authority: the Constitution specifically empowers us only to censure or remove a judge. (Cal. Const., art. VI, § 18, subd. (c).)

 The purpose of these proceedings is not to punish errant judges but to protect the judicial system and those subject to the awesome power that judges wield. (*Wenger, supra,* 29 Cal.3d at p. 654.) For all the reasons stated herein, that purpose will best be served in this case by adopting the recommendation of the masters and of the Commission.

We order that Judge Robert H. Furey, Jr., of the Catalina Justice Court District, Los Angeles County, be removed from office. Because the misconduct for which he is removed does not amount to grounds for disbarment or suspension from the practice of law, he shall, if otherwise qualified, be permitted to continue to practice law (Cal.Const, art. VI, § 18, subd. (d); see *Wenger* v. *Commission on Judicial Performance, supra,* 29 Cal.3d at p. 654), but he shall be required to pass the Professional Responsibility Examination within one year (see *Gonzalez* v. *Commission on Judicial Performance, supra,* 33 Cal.3d at p. 378); *Segretti* v. *State Bar* (1976) 15 Cal.3d 878, 891, fn. 8 [126 Cal.Rptr. 793, 544 P.2d 929]). This order is final forthwith.

Petitioner's application for a rehearing was denied December 17, 1987, and the opinion and judgment were modified to read as printed above.