*CJP Supp. 147 Opinion
KELLY, Commission Member.
This disciplinary matter concerns Judge W. Jackson Willoughby, a judge of the Placer County Superior Court. Judge Willoughby (respondent) was bom in 1935. Respondent was appointed to the Placer County Municipal Court in March 1993, and was elevated to the superior court in 1997.
SUMMARY
The commission finds that Judge Willoughby engaged in a pattern of inappropriate conduct in the workplace toward female employees consisting of (1) the improper and unwanted touching of his bailiff’s breasts; (2) staring at and asking to see his bailiff’s breasts; (3) making a sexually suggestive comment to a deputy sheriff; and (4) making a derogatory reference to a female deputy district attorney. These activities violate the California Code of Judicial Ethics, canons 1 and 2A, as alleged in the second amended notice of formal proceedings. The commission finds that the allegations concerning the judge’s court clerk in 1997 and 1998 were not proved by clear and convincing evidence. For the reasons set forth in this decision, the commission publicly censures Judge Willoughby.
PROCEDURAL HISTORY
Formal proceedings in this matter commenced with the filing on March 18, 1999, of a notice of formal proceedings. On March 31, 1999, respondent filed his verified answer. The notice was amended on June 28, 1999, and August *CJP Supp. 148 26, 1999, and respondent filed verified answers to the amended notices on July 12, 1999, and August 26, 1999.
As provided for by rule 121(b) of the Rules of the Commission on Judicial Performance, the Supreme Court appointed three special masters to conduct an evidentiary hearing and to prepare a written report. The evidentiary hearing was held in three parts, commencing on September 7, 1999, and concluding on October 18, 1999, before Justice Paul Turner, presiding, of the Court of Appeal, Second Appellate District, Judge Ken M. Kawaichi of the Superior Court of Alameda County, and Judge Marguerite L. Wagner of the Superior Court of San Diego County. The special masters filed their report to the commission on January 3, 2000.
Following the receipt of objections and briefs from respondent and the office of trial counsel, the matter was orally argued before the commission on March 8, 2000, and reargued on May 2, 2000. Mr. Jack Coyle presented argument on behalf of trial counsel and Mr. Michael S. Sands presented argument on behalf of respondent.
FINDINGS OF FACT ON SUSTAINED COUNTS
Paragraph one of count one of the second amended notice of formal proceedings alleged that, from approximately November 1997 through June 1998, respondent engaged in a pattern of inappropriate conduct in the workplace toward female court employees, in violation of the California Code of Judicial Ethics, canons 1, 2A, 3B(4) and 3B(5). The count set forth specific charges concerning five persons.
1. Deputy M_. The notice alleged that, in April 1998, respondent’s bailiff, Deputy M_, had breast implant surgery of which respondent was aware and that, following the surgery, respondent frequently stared at her breasts and on more than one occasion asked when he would get to see her breasts. Moreover, it was alleged that on “a Monday in May 1998, in chambers, you rubbed [your bailiff’s] breasts. The contact was not consensual.”
The bailiff testified that she had worked in law enforcement for 13 years and became respondent’s courtroom bailiff in 1995 or 1996. The bailiff explained that she decided to tell respondent about her scheduled breast implant surgery because she would be “off for a period of time” and would not be in uniform for a couple of weeks when she came back. A day or two before the surgery, the bailiff and the clerk met with Judge Willoughby in his chambers and advised him that the bailiff was going to have breast implant surgery. The bailiff testified that they showed respondent a pamphlet, that he *CJP Supp. 149 asked if it was a safe procedure and told the bailiff that she was sexy just the way she was. The bailiff also testified that she had been losing weight at that time and that respondent had told her how nice she looked. She did not find the remark offensive because everybody was telling her that.
The masters’ report sets forth the bailiff’s version of the incident as follows: “[She] testified that on either May 4 or May 1, 1998, she went into Judge Willoughby’s chambers in order to tell him the parties were ready for court to be called to order. After her breast augmentation surgery, Deputy M_experienced an infection, which required she take an antibiotic. The infection did not affect her ability to work although she was not in uniform. Judge Willoughby was walking out of the restroom and he said to Deputy M_: ‘Come here. Come here.’ Deputy M_testified his tone of voice was such that it sounded as though Judge Willoughby was making an order to her. She testified the following then happened: ‘He gave me a hug and told me he hoped that I was feeling better.’ The hug lasted for a very brief period of time. Thereupon, according to Deputy M_, Judge Willoughby grabbed her. Judge Willoughby then began to rub both of her breasts. She testified, ‘He just open-handedly grabbed both of my breasts and started rubbing.’ She described that he was using both hands. She did not know how long Judge Willoughby was rubbing her breasts nor if he said anything. She then walked into the courtroom.”
Respondent agreed that he had touched one of his bailiffs breasts but testified that the incident occurred differently. The bailiff developed an infection after the surgery and told respondent that she was experiencing an infection. Respondent testified that some time before the incident, while fully clothed, the bailiff lifted her breast and pointed to the area of the infection. The masters’ report summarizes respondent’s version of the incident as follows: “[The bailiff], wearing civilian clothing, entered the chambers being used by Judge Willoughby and made a number of complaints about her personal life. Judge Willoughby testified that he tried to comfort her and told her, ‘hang in there, it will get better.’ Judge Willoughby testified the following occurred: ‘Well, we, I hugged her, we hugged each other actually. So I had my arms around her and I was kind of patting her on the back.’ Judge Willoughby testified that he then touched one of Deputy M_’s breasts. He testified as follows: ‘Well, what happened was probably the biggest mistake of my life. My hands went from holding her and it came around the side and I apparently caressed her left breast for a moment and then when I realized what I’d done, I immediately took my hand away.’ He testified his right hand touched her left breast. Judge Willoughby described Deputy M_’s reaction after he withdrew his hand as follows, 1 saw someone whom I thought felt better, was less upset than she was when she came into the chambers ...[][] she looked up at me and said, thank you for caring about me.’ Judge Willoughby said nothing back to Deputy M_according to his testimony. *CJP Supp. 150 Judge Willoughby described his immediate reaction to the act of touching Deputy M_’s left breast as follows: ‘Well, I was utterly humiliated and embarrassed over what I’d done. I guess I was playing ostrich and I kind of put my head in the sand and hoped that it would go away. I think, I believe that if I had been smart enough to apologize right then and there I don’t think all of this would have happened. I think she would have accepted that. But I didn’t.’ ”
The masters also note respondent’s testimony that, sometime after the incident, he again hugged his bailiff when she was upset about a case involving a defendant who was convicted of driving under the influence of alcohol. He testified that she was crying and he hugged her. He described what occurred during the hug as follows: “Because when it occurred I was conscious of what happened the last time and I wasn’t going to let that mistake happen again. So I was very careful when I, when we disengaged from the hug, put my hands at my side and not let them wander.”
The masters found that the bailiff’s version of what occurred was more credible. They found respondent’s recollection of the facts not to be persuasive for a number of reasons including: (1) respondent’s claim that he did not act out of a sexual impulse was not credible, and he “offered no credible alternative explanation”; (2) respondent claimed he was humiliated the instant he grabbed his bailiff’s breast and that “she thanked him for caring about her after he grabbed her breast,” but “[t]here is no credible evidence she was then or ever thankful for being grabbed in the breast area”; (3) there is no merit to respondent’s testimony that he did not know the bailiff was on duty when he touched her and that he did not know she was a subordinate; (4) “the argumentative nature of Judge Willoughby’s unwillingness to admit that he intentionally touched [the bailiff] is unpersuasive”; and (5) although respondent testified that the bailiff referred to the breast augmentation surgery as a “boob job,” every other witness who was asked denied that the bailiff used that phrase.
The masters noted that the bailiff testified that, after she returned from surgery, respondent stared at her breasts and that respondent never denied that after her surgery he would stare at her breasts. Although other witnesses testified that they had not seen respondent look at women’s breasts, they had not observed respondent and his bailiff in April and May 1998. The masters concluded that there was “clear and convincing evidence Judge Willoughby stared at Deputy M_’s breasts as she testified.”
The masters also found that respondent asked to see the bailiff’s breasts, citing her testimony, their lack of confidence in his testimony and his admitted touching of her breast.
*CJP Supp. 151 2. Deputy Sheriff P_. The notice charges that in approximately April 1998, a bailiff for another judge, Deputy Sheriff P_, was changing her uniform shirt in a hallway in the courthouse when she observed respondent standing nearby staring at her. When she asked if she was in his way, he answered, “I could stand here and watch you undress all day.”
The deputy sheriff testified that she was removing her uniform shirt in the hallway in the courthouse where she has a locker. Under her uniform shirt she wore a T-shirt. As she was doing so, she looked up and saw respondent watching her. She asked him if he needed to get by her as she was blocking access through the hall to a bathroom. She testified that respondent answered, “No, I could stand here and watch you all day get undressed.” Respondent could not recall such an occurrence. He admitted that if he had said something to the effect of what the deputy sheriff stated it would have been done in a facetious or sarcastic fashion. The masters found that the events happened as the deputy sheriff testified.
3. Deputy District Attorney M_. The notice charges that on at least one occasion respondent, in the presence of his clerk and bailiff, referred to a female deputy district attorney as “Old Iron Tits.”
The bailiff and the clerk testified that one day when they were walking with respondent to lunch outside the courthouse, Deputy District Attorney M_ was walking nearby and that respondent mentioned that he called the deputy district attorney “Old Iron Tits.” Respondent did not recall the incident but admitted that he probably referred to the attorney in the derogatory fashion alleged. Before the masters, respondent testified that he thought the deputy district attorney did a great job in court and that the nickname did not originate with him, he had heard the phrase at a judges’ meeting. When asked by a master, respondent refused to identify the one or more judges who used the phrase. The masters found that respondent made the remark and that it constituted prejudicial conduct.
4. Courtroom Clerk Ms. S_. The notice charges that between approximately March and September 1996, on more than one occasion in the courthouse, respondent “pressed [his] lips together and made a kissing sound directed towards” his former clerk “apparently to thank her for work she had done.” It is further alleged that during the same period of time, when the clerk asked if she could work in her office because her presence in court was not necessary, respondent answered, “I just want you to sit there and look pretty.”
The former clerk testified that, when she was employed as respondent’s law and motion clerk, she lacked the training necessary to handle the long *CJP Supp. 152 hours and heavy calendar. Accordingly, she asked respondent whether she could leave the courtroom during the law and motion calendar to complete her paperwork in her office. She testified that respondent said, “I just want you to sit there and look pretty.” Respondent testified that he did not require his former clerk to be in the courtroom when she was not needed. He did not recall saying anything like “just sit there and look pretty.” The masters found that there was “clear and convincing evidence that Judge Willoughby made the statement concerning sitting in the courtroom and looking pretty.”
The masters noted that the former clerk testified that respondent would pucker his lips and kiss from afar and that her testimony was essentially uncontradicted. They also noted that respondent’s wife testified that he often engaged in the “kissing” motion and in hugging people.
The masters determined that respondent’s actions concerning his bailiff, his statement to the deputy sheriff, and his derogatory reference to a deputy district attorney constituted a pattern of inappropriate conduct in the workplace towards female court employees as charged in the second amended notice of formal proceedings.[1] In making this finding, the masters had the benefit of observing the demeanor of the various witnesses, and accordingly their determination is entitled to special weight. (Dodds v. Commission on Judicial Performance (1995) 12 Cal.4th 163, 168 [48 Cal.Rptr.2d 106, 906 P.2d 1260].) The commission has reviewed the record and adopts the masters’ finding that respondent engaged in a pattern of inappropriate conduct in the workplace towards female court employees.
FINDINGS OF FACT ON DISMISSED COUNTS
1. Count one. This count also alleged that in November 1997, respondent pressed his “groin area into the buttocks of [his] clerk,” while in chambers, and that from approximately 1997 through June 1998 “[he] frequently stared at clerk [M_’s] breasts, while you were in court and elsewhere in the courthouse.”
The clerk’s testimony supported the allegations and the masters found her to be a credible witness, but they concluded that the allegations were not sustained by clear and convincing evidence. They noted that over time the clerk’s testimony had changed. At her deposition in her civil action she stated *CJP Supp. 153 that the incident with respondent occurred on November 26, 1997, and that she telephoned two friends after the incident. At the hearing, she was no longer sure as to when the incident occurred. Furthermore, her telephone records failed to disclose any telephone calls to her friends on November 26, 1997. The masters noted that the clerk testified that she immediately left work after the incident, but her work records for November 26, 1997, indicate that she did not leave work early.
The masters also noted that when the clerk first gave a statement to an investigator in the summer of 1998, she had forgotten many of the details of the incident. She stated, “When he went by, rather than just walking, what he did was brush up—basically going groin to fanny. And you could just say that maybe he was just scooting by.” In her deposition in the civil action and before the masters, the clerk testified that she was leaning over a chair in chambers when respondent walked up behind her and pressed his groin against her backside, and stayed there for a little while. She stated that “it felt like he was becoming aroused.” There was uncontradicted medical and testimonial evidence that this could not have occurred. Furthermore, the clerk’s friends were unable to corroborate her details.
The masters noted that while the clerk and respondent’s bailiff [Deputy M_] testified that respondent stared at his clerk’s breasts, other witnesses who were queried on the subject, including two women whose testimony was otherwise adverse to respondent, denied ever having seen respondent stare at his clerk’s breasts or the breasts of other women. The masters found that in light of the conflicting evidence, the examiners had failed to carry the burden of proving the allegation by clear and convincing evidence.
The commission agrees that the allegations concerning the clerk were not sustained by clear and convincing evidence and they are dismissed.[2]
2. Count two. The second amended notice charged that, in August 1997 when the clerk [Ms. M_] was in respondent’s courtroom during normal business hours helping respondent prepare for a judicial conference, he “came into the courtroom with a bottle of alcohol and asked her if she wanted to join [him] in a drink. [The clerk] acquiesced and [he] made two alcoholic drinks, one of which [he] drank in the courtroom.” The notice alleges that this conduct violated canons 1 and 2A of the California Code of Judicial Ethics.
The masters found that the incident occurred but that there was no violation of any canon. They note that at no time did a member of the public *CJP Supp. 154 enter the courtroom while the clerk had the drink and that there was no evidence that the drink affected her in connection with her duties. They also note that there was no evidence that offering a drink to the clerk—who was clearly an adult—violated any criminal statute and that there was credible evidence that the historic courthouse had “been used for several activities where alcohol has been served and consumed by state and county dignitaries.” There was no evidence of a pattern or practice of using the courthouse for drinking or that respondent ever was under the influence of alcohol while on the bench.
The commission agrees with the masters that the evidence on count two does not support a finding of any violation of the California Code of Judicial Ethics and count two is dismissed.[3]
CONCLUSIONS OF LAW
The masters found that respondent’s conduct on all the proven factual allegations in count one constituted prejudicial misconduct. In Kennick v. Commission on Judicial Performance (1990) 50 Cal.3d 297, 314 [267 Cal.Rptr. 293, 787 P.2d 591], the California Supreme Court reiterated that prejudicial conduct “means ‘conduct which a judge undertakes in good faith but which nevertheless would appear to an objective observer to be not only unjudicial conduct but conduct prejudicial to public esteem for the judicial office.’ (Geiler v. Commission on Judicial Qualifications [(1973)] 10 Cal.3d 270, 284 [110 Cal.Rptr. 201, 515 P.2d 1] . . . .)” (See also Broadman v. Commission on Judicial Performance (1998) 18 Cal.4th 1079, 1104 [77 Cal.Rptr.2d 408, 959 P.2d 715].)
Trial counsel suggest that the commission could conclude that respondent’s touching of his bailiff’s breasts constituted willful misconduct. In Broadman v. Commission on Judicial Performance, supra, 18 Cal.4th at page 1091, the Supreme Court reiterated that to commit willful misconduct in office, “a judge must (1) engage in conduct that is unjudicial and (2) committed in bad faith, (3) while acting in a judicial capacity.” Trial counsel opine that the “judicial capacity” element might be met, even though respondent was not acting as a “judge” at the time, by the fact that the touching took place in respondent’s chambers. They argue that respondent’s judicial work is the only reason that he and the bailiff were in his chambers at the time of the incident.
The commission declines to adopt trial counsel’s approach at this time. Such a determination would not enlarge the discipline options available to the *CJP Supp. 155 commission, as the Constitution allows for the removal of a judge for “conduct prejudicial to the administration of justice that brings the judicial office into disrepute” as well as for willful misconduct.[4] Furthermore, the cases cited by trial counsel do not necessarily compel their conclusion.[5]
The commission agrees with the masters that respondent’s touching of his bailiff’s breasts as well as his staring at her breasts and asking to see them constitute conduct prejudicial to the administration of justice that brings the judicial office into disrepute.
The commission also agrees with the masters that Judge Willoughby’s statement to the deputy sheriff, his reference to a deputy district attorney as “Old Iron Tits,” his command to his former court clerk to “sit there and look pretty,” and his making the “kissing motion” toward his former court clerk, *CJP Supp. 156 all constitute conduct prejudicial to the administration of justice that brings the judicial office into disrepute.
DISCIPLINE
In 1994 the voters of California amended the California Constitution to give the commission the authority to “censure a judge ... or remove a judge for action . . . that constitutes willful misconduct in office ... or conduct prejudicial to the administration of justice that brings the judicial office into disrepute.” (Art. VI, § 18, subd. (d).)
The Supreme Court has indicated that the purpose of a commission disciplinary proceeding is not punishment, “ ‘but rather the protection of the public, the enforcement of rigorous standards of judicial conduct, and the maintenance of public confidence in the integrity and independence of the judicial system.’ ” (Broadman v. Commission on Judicial Performance, supra, 18 Cal.4th at p. 1112, citing Adams v. Commission on Judicial Performance (1995) 10 Cal.4th 866, 912 [42 Cal.Rptr.2d 606, 897 P.2d 544].) In determining whether to remove a judge from office or to publicly censure a judge, the commission must carefully consider whether his or her misconduct requires such a severe remedy and whether any lesser discipline would meet these purposes.
A. Precedent
The Supreme Court has indicated that the commission is not bound by precedent in determining the appropriate discipline in a case. In Broadman v. Commission on Judicial Performance, supra, 18 Cal.4th at page 1112, the court in adopting the commission’s recommendation of public censure noted: “According to petitioner, public censure in his case is improper because his misconduct is less egregious than that of judges publicly censured in previous cases. Proportionality review based on discipline imposed in other cases, however, is neither required nor determinative. The factual variations from case to case are simply too great to permit a meaningful comparison in many instances. ‘Choosing the proper sanction is an art, not a science, and turns on the facts of the case at bar.’ (Furey v. Commission on Judicial Performance [(1987)] 43 Cal.3d [1297,] 1318 [240 Cal.Rptr. 859, 743 P.2d 919].)” Nonetheless, earlier Supreme Court cases suggest that the commission’s decision on what discipline to impose should be informed by some comparison with similar cases. (See Kennick v. Commission on Judicial Performance, supra, 50 Cal.3d at pp. 339-340; Dodds v. Commission on Judicial Performance, supra, 12 Cal.4th at pp. 178-179.)
*CJP Supp. 157 In most instances, as in this case, neither the Supreme Court nor the commission has had any difficulty identifying inappropriate conduct toward women. However, past cases offer less guidance on the appropriate discipline.
The only time the Supreme Court removed a judge from office for sexually offensive activity was its first removal, Geiler v. Commission on Judicial Qualifications, supra, 10 Cal.3d 270. Judge Geiler was removed for numerous inappropriate acts. The court noted: “Petitioner was found to have prodded a deputy public defender with a ‘dildo’ during a conference in chambers one morning, and later that day to have referred to this incident twice in open court so as to curtail the victim’s cross-examination of two witnesses. Petitioner was found to have approached a court commissioner from behind in a public corridor of the hall of justice and to have grabbed this victim’s testicles. Petitioner was found on two occasions to have made lustful references to his female clerk, once while in chambers in the presence of a group of professional associates. Petitioner was found to have habitually used vulgar and profane language in his conversations with this clerk, and on two occasions to have used profane terms of personal abuse in reprimanding her and another woman employed by the court. Petitioner was also found to have invited two female attorneys into his chambers wherein he discoursed on the salacious nature of the evidence adduced in criminal cases concerning homosexual acts and rape, punctuating his commentary with profane terms for bodily functions.” (10 Cal.3d at p. 277.)[6]
In In re Stevens (1981) 28 Cal.3d 873, 874 [172 Cal.Rptr. 676, 625 P.2d 219], the Supreme Court followed the commission’s recommendation and publicly censured Judge Stevens.[7] For a period of over three years the judge had, despite objections, repeatedly initiated conversations with a married couple in which he discussed his sexual experiences and fantasies and proposed that the couple engage in various kinds of sexual activity with him and with other persons, all in explicit, vulgar, and offensive language, all to gratify his own sexual desires.
In Fitch v. Commission on Judicial Performance (1995) 9 Cal.4th 552 [37 Cal.Rptr.2d 581, 887 P.2d 937], the commission recommended that Judge *CJP Supp. 158 Fitch be publicly censured for engaging in a pattern of misconduct involving inappropriate and offensive remarks to court staff, court attachés and attorneys, and nonconsensual touchings of women working under his supervision. The Supreme Court publicly censured Judge Fitch finding that he “made offensive remarks to female court reporters or clerks concerning their buttocks, breasts, or legs,” “made offensive remarks to female court attachés or attorneys regarding their intimate relationships with their spouses,” “made other offensive and crude remarks in the presence of court staff,” and on a few isolated occasions, “singled out women working under his supervision for inappropriate and nonconsensual touching, or attempted touching. (E.g., he slapped or patted a court reporter and a court trainee on their buttocks.)” (9 Cal.4th at pp. 556-557.)
In In re Gordon (1996) 13 Cal.4th 472 [53 Cal.Rptr.2d 788, 917 P.2d 627], the commission had found that over an 18-month period of time: “Judge Gordon on several occasions made sexually suggestive remarks to and asked sexually explicit questions of female staff members; referred to a staff member using crude and demeaning names and descriptions and an ethnic slur; referred to a fellow jurist’s physical attributes in a demeaning manner; and mailed a sexually suggestive postcard to a staff member addressed to her at the courthouse.” (13 Cal.4th at pp. 473-474.) The Supreme Court publicly censured Judge Gordon (as recommended by the commission), noting that none of the conduct occurred while court was in session or the judge was on the bench conducting the business of the court, and that “the actions were taken in an ostensibly joking manner and there was no evidence of intent to cause embarrassment or injury, or to coerce, to vent anger, or to inflict shame . ...” (13 Cal.4th at p. 474.)
In the last two years the commission has issued two disciplinary decisions concerning inappropriate conduct in the workplace towards female court employees. On October 26, 1998, the commission, pursuant to a unanimous vote, issued a public admonishment of Judge Harvey H. Hiber. It found that, after convincing a woman to become his courtroom clerk in the fall of 1994, Judge Hiber engaged in a pattern of insistent and unwelcome behavior. He wrote to her repeatedly while on vacation, prepared and presented the woman with a “sexual harassment waiver” (which she refused to sign), repeatedly asked her to spend time with him outside of court hours, frequently interrupted her while she was working to discuss nonwork-related matters, on one occasion called her at home, on at least one occasion brought flowers to her home when she was ill, and on one occasion, “he kissed her on the mouth after taking her to her car near the courthouse, for which he apologized.” The commission noted in mitigation that Judge Hiber cooperated with the commission and had acknowledged that his actions toward his clerk were inappropriate.
*CJP Supp. 159 Most recently on January 28, 2000, the commission issued a public admonishment of Judge John B. Gibson for engaging in a pattern of inappropriate conduct in the workplace toward female court employees. Eight separate acts of inappropriate conduct were identified. They included giving a female county employee who had just resigned an unwelcome and unconsented-to full kiss on the lips; wiggling his finger out of his judicial robes in the area of his groin and saying to Ms. Huntsman, the court clerk, “Say hello to Mr. Bobo”; sending Ms. Huntsman a memorandum that contained suggestive sexual references; commenting to Ms. Huntsman that “he really enjoyed seeing [another female employee] walk in the door with her light-colored sweater on and her 46DD bra and her nipples showing”; and commenting to a friend when Ms. Huntsman came into his chambers, “Isn’t that the best looking pair of legs and ass you’ve ever seen?”
In mitigation the commission noted that the masters found that the judge’s behavior was for the most part limited to Ms. Huntsman, that she encouraged “a less than professional relationship,” and that Judge Gibson recognized that he should not have continued the relationship, as before, after he became a judge.
In deciding to publicly admonish rather than censure Judge Gibson for his “completely unacceptable conduct,” the commission noted that it believed:
“[Sjeveral circumstances mitigate the risk of further violations by Judge Gibson of the sort proved in this matter. First, the vast majority of the incidents involved Ms. Huntsman, with whom Judge Gibson had an unusual relationship. Second, Judge Gibson has recognized his responsibility for his mistakes and has apologized for his actions. Third, the events in question all occurred over six years ago, when Judge Gibson was new to the bench; no subsequent similar conduct has been reported in the interim. Fourth, the commission has before it considerable character evidence attesting to Judge Gibson’s exemplary behavior over the last six years. Furthermore, Judge Gibson has already suffered (to use his counsel’s words) the ‘public humiliation’ of the widespread publicity of these embarrassing incidents.
“In addressing charges such as those brought against Judge Gibson by Ms. Huntsman, the commission would ordinarily be concerned that an aggrieved party might face continuing unacceptable conduct or would lack access to remedies other than those provided by the commission.”
B. Mitigating considerations
Some of the considerations noted by the commission in its public admonishment of Judge Gibson are relevant to this case. Respondent’s most serious *CJP Supp. 160 misconduct concerned a single employee, his bailiff. Respondent, however, did not have the type of mitigating “unusual relationship” with his bailiff that Judge Gibson had with Ms. Huntsman.
Respondent recognizes the impropriety of his touching his bailiff’s breasts and has issued a public apology. Respondent voluntarily resigned as presiding judge and admitted to the touching in his first response to the commission’s inquiry. The evidence also shows that respondent of his own volition immediately sought out and attended a course on avoiding sexual harassment. Although respondent did not apologize until a civil lawsuit settled, he explained that this was because he was instructed, from the time that the bailiff told her supervisor of the judge’s misconduct, not to have any contact with the bailiff. Judge Willoughby’s public apology not only admitted his misconduct, but also praised the bailiff’s performance as a bailiff.
Respondent had been a judge for a handful of years at the time of the incidents. He was appointed to the municipal court in 1993 and was elevated to the superior court in 1997. Respondent submitted character evidence and considerable evidence of his contributions to the judicial system. Respondent was involved in the initiation and development of various innovative judicial programs including: the drug court program in Placer County; the Driving Under the Influence Victim Impact Program; the telephone conference call program; the Placer County Domestic Violence Task Force; and the Peer Court (a program designed to assist juvenile offenders).
Respondent has certainly suffered “public humiliation” from the widespread publicity generated by his misconduct. The commission is aware that the filing of a notice of formal proceedings inherently gives rise to some “public humiliation.” Respondent’s exposure, however, has two unusual features. First, as a result of his misconduct and the investigation generated by his misconduct, respondent has been barred from the courthouse for over twenty months. Second, in the course of these proceedings, respondent felt compelled to reveal several aspects of his private life that should not ordinarily become a matter of public knowledge. Placer County is a relatively small county in terms of population. There can be little doubt that Judge Willoughby’s neighbors now know considerably more about Judge Willoughby than Judge Willoughby, and perhaps the neighbors, would like.
In this case, the bailiff availed herself of her civil remedies. She filed a sexual harassment lawsuit against respondent, the county and the State of California. The suit was settled for $165,000. Respondent paid $10,000 from *CJP Supp. 161 his own funds, his insurer paid $10,000, and the balance of the settlement was paid by the county and the state.[8]
Respondent’s recognition of the impropriety of his actions, his public apology, his additional education on sexual harassment and the settlement of the civil lawsuit arguably suggest that there is little likelihood of the bailiff facing continuing unacceptable conduct. The other victims of respondent’s prejudicial conduct also do not face continuing improper conduct. Respondent’s former courtroom clerk and the former deputy district attorney are not now in Placer County, and the deputy sheriff was, and presumably remains, the bailiff for another judge.
The other cases cited as precedent weigh in favor of discipline in the form of censure or some other form of public reproval. Respondent’s conduct— although completely unacceptable—is clearly different from the conduct that led to the Supreme Court’s removal of Judge Geiler. Judge Fitch engaged in many more acts of misconduct than respondent did, including the touching of female subordinates, but was censured, not removed. Similarly, Judge Gordon appears to have engaged in many more incidents of misconduct than respondent and was censured, not removed. The Supreme Court noted that Judge Gordon’s misdeeds were not committed while the court was in session or the judge was on the bench and that there was “no evidence of intent to cause embarrassment or injury, or to coerce, to vent anger, or to inflict shame.” (In re Gordon, supra, 13 Cal.4th at p. 474.) Here, the masters found that respondent’s improper touching of his bailiff’s breasts was not done in his judicial capacity, and there is no suggestion that respondent ever intended to cause embarrassment, injury or shame.
C. Criteria for removal
As noted, the California Constitution provides that a judge may be removed for conduct prejudicial to the administration of justice. Furthermore, it is settled that for removal the unjudicial conduct need not “amount to moral turpitude, dishonesty or corruption” (Geiler v. Commission on Judicial Qualifications, supra, 10 Cal.3d at p. 287). However, determining whether to remove a judge from office, like choosing any other sanction is an art, not a science. (See Broadman v. Commission on Judicial Performance, supra, 18 Cal.4th at p. 1112.)
A review of the Supreme Court’s opinions removing judges from office reveals two common considerations. First, the Supreme Court always *CJP Supp. 162 noted that the judge who was being removed engaged in numerous acts of misconduct over an extended period of time. Most recently, in Fletcher v. Commission on Judicial Performance (1998) 19 Cal.4th 865, 918 [81 Cal.Rptr.2d 58, 968 P.2d 958], the Supreme Court, in agreeing with the commission’s recommendation to remove Judge Fletcher, noted: “ ‘The number of wrongful acts is relevant to determining whether they were merely isolated occurrences or, instead, part of a course of conduct establishing “lack of temperament and ability to perform judicial functions in an even-handed manner.” [Citation.]’ (Wenger[ v. Commission on Judicial Performance (1981)] 29 Cal.3d [615,] 653 [175 Cal.Rptr. 420, 630 P.2d 954].) We have determined that petitioner twice committed willful misconduct and committed prejudicial misconduct on multiple occasions. ‘Together these incidents reflect a continuing, pervasive pattern of’ misconduct. (Kloepfer[ v. Commission on Judicial Performance (1989)] 49 Cal.3d [826,] 849 [264 Cal.Rptr. 100, 782 P.2d 239].) ‘Petitioner’s lack of judicial temperament is manifest.’ [Fn. omitted.] (Kloepfer, supra, at p. 866.)”
“In concluding that removal is unwarranted in this case, the dissent asserts that petitioner’s conduct is less egregious and offensive than that before us in Broadman, where we imposed public censure. (Dis. opn. of Kennard, J., post, at p. 923.) However, Broadman involved only three isolated acts of mi scon - duct. (Broadman, supra, 18 Cal.4th at p. 1112.) By contrast, this case involves a continuing and pervasive pattern of misconduct. . . .” (Fletcher v. Commission on Judicial Performance, supra, 19 Cal.4th at p. 918, fn. 28.)
The Supreme Court has consistently commented on the numerous acts of misconduct. (See Adams v. Commission on Judicial Performance, supra, 10 Cal.4th 866 [Judge Adams was removed from office for engaging “in successive extrajudicial transactions that extended over a significant period of time, creating an appearance of serious impropriety and thereby tending to diminish the public esteem of the judiciary—a consequence petitioner either deliberately ignored or was unable to appreciate.” (10 Cal.4th at p. 914.)]; Kloepfer v. Commission on Judicial Performance, supra, 49 Cal.3d 826 [judge removed for a continuing, pervasive pattern of misconduct—four charges of willful misconduct and twenty-one charges of prejudicial conduct]; McCullough v. Commission on Judicial Performance, supra, 49 Cal.3d 186 [Judge McCullough was removed for committing four acts of willful misconduct and one act of persistent failure and because his failure to respond to a prior public censure evidenced a lack of regard for the commission, this court and his obligations as a judge.]; Ryan v. Commission on Judicial Performance, supra, 45 Cal.3d 518 [judge removed for having committed four acts of willful misconduct and fourteen acts of prejudicial conduct]; Furey v. Commission on Judicial Performance, supra, 43 Cal.3d 1297 [judge removed for eight acts of willful misconduct and ten acts of prejudicial conduct]; Gonzalez v. Commission on Judicial Performance, supra, 33 Cal.3d 359 *CJP Supp. 163 [judge removed for 18 counts of willful misconduct and two counts of prejudicial conduct]; Wenger v. Commission on Judicial Performance, supra, 29 Cal.3d 615 [judge removed for nine counts of willful misconduct and one count of prejudicial conduct]; Cannon v. Commission on Judicial Qualifications (1975) 14 Cal.3d 678 [122 Cal.Rptr. 778, 537 P.2d 898] [judge removed for 21 acts of willful misconduct and eight acts of prejudicial conduct]; Spruance v. Commission on Judicial Qualifications (1975) 13 Cal.3d 778 [119 Cal.Rptr. 841, 532 P.2d 1209] [judge removed for 11 counts of willful misconduct and prejudicial conduct]; and Geiler v. Commission on Judicial Qualifications, supra, 10 Cal.3d 270 [judge removed for six counts of misconduct which included 23 specified acts].)
Second, the court often comments on the judge’s failure to appreciate or to admit to the impropriety of his or her acts and that he or she is unlikely to reform. In Fletcher, supra, 19 Cal.4th 865, 919, the Supreme Court noted that “contrary to the contrite tone he sounds in this court, petitioner’s primary response to the misconduct allegations during the Commission proceedings was to allege a conspiracy against him.” (Ibid.) The court agreed with the commission that Judge Fletcher’s conspiracy claims were reminiscent of those that the court had rejected in Gonzalez v. Commission on Judicial Performance, supra, 33 Cal.3d 359.[9] The Supreme Court concluded as to Judge Fletcher that: “[T]he record ‘belies petitioner’s claim that he has learned from past experience and has modified his courtroom behavior. It demonstrates instead an inability to appreciate the importance of, and conform to, the standards of judicial conduct that are essential if justice is to be meted out in every case.’ (Kloepfer, supra, 49 Cal.3d at p. 866, fn. omitted, original italics.) It ‘does not suggest that petitioner has, or will be able to, overcome [his demonstrated lack of judicial temperament] and that similar incidents will not recur.’ (Ibid.)” (19 Cal.4th at pp. 920-921.)
In Doan v. Commission on Judicial Performance (1995) 11 Cal.4th 294, 339 [45 Cal.Rptr.2d 254, 902 P.2d 272], the Supreme Court removed a judge for willful and prejudicial conduct that displayed moral turpitude, dishonesty and corruption. The court noted, however, that it “would hesitate to remove a judge who showed himself ready, willing, and able to reform under a less severe sanction.” (Ibid.) Judge Doan, however, did not learn from her two prior reprovals and private admonishment. The court concluded, “Doan has had three opportunities for reformation. She will have no more.” (11 Cal.4th at p. 340.)
*CJP Supp. 164 In Kennick v. Commission on Judicial Performance, supra, 50 Cal.3d 297, the Supreme Court declined to remove Judge Kennick from office because of misconduct (it did remove him for his persistent failure or inability to perform judicial duties). The court wrote: “Viewed as a whole, petitioner’s misconduct does not appear so continuing or pervasive as to preclude his reform. (Cf. Kloepfer v. Commission on Judicial Performance, supra, 49 Cal.3d 826, 866.) Thus, it seems likely that our public censure of each of petitioner’s misdeeds would have led him to correct and improve his judicial behavior. (See In re Rasmussen (1987) 43 Cal.3d 536, 538 [236 Cal.Rptr. 152, 734 R2d 988].) Accordingly, we decline to order him removed from office for willful misconduct or prejudicial conduct.” (50 Cal.3d at p. 341.)
D. Application to respondent
Since the advent of the commission, judges have been held to a higher standard of conduct than attorneys. (See Geiler v. Commission on Judicial Qualifications, supra, 10 Cal.3d at p. 287.) Here, Judge Willoughby’s conduct, particularly his touching of his bailiff’s breasts, is clearly unacceptable. As the masters noted, Judge Willoughby did not need any training on avoiding sexual harassment to know that it was wrong to touch his bailiff’s breasts. His conduct seriously undermines confidence in his integrity and the integrity of the judiciary in violation of canons 1 and 2A of the California Code of Judicial Ethics. The public, court staff and other judges deserve to be reassured by the commission that conduct such as Judge Willoughby’s touching of his bailiff’s breasts is totally unacceptable and will result in serious discipline.
The commission, however, feels constrained by precedent, the criteria for removal used by the Supreme Court, and the mitigating factors in this case to publicly censure respondent rather than remove him from office. Judge Willoughby admits his conduct was clearly wrong. The conduct took place over a two-month period of time in 1998, following his bailiff’s breast implant surgery. Indeed, all the proven incidents that constitute the pattern of inappropriate conduct in the workplace toward female court employees took place in the late spring of 1998.[10] Furthermore, whatever his motive, Judge Willoughby immediately sought additional information and training on avoiding sexual harassment. These facts will not allow the commission to conclude that Judge Willoughby will not or cannot correct and improve his behavior.
*CJP Supp. 165 In addition, the complaint that initiated this case was the first time that the commission was informed of any allegation of gender discrimination or inappropriate conduct concerning staff by respondent. Although the second amended notice of formal proceedings alleged a second incident of touching, respondent has consistently denied the allegation, the masters found that the allegation was not sustained, and trial counsel characterized the masters’ finding as “a very thorough and rational analysis.” On the facts as found by the masters, the commission cannot conclude that Judge Willoughby’s pattern of inappropriate conduct is so continuing or pervasive as to preclude his reformation.
The commission’s reluctance to remove Judge Willoughby from office should not be construed to suggest that the commission will not in the future remove a judge from office, even for a single act of prejudicial conduct, where warranted. Rather, the commission in crafting the appropriate discipline for the particular facts of this case, has determined that one clearly wrongful act, coupled with a minimal number of lesser acts sufficient to constitute a pattern of inappropriate conduct in the workplace toward female court employees, constitutes a most serious violation meriting severe discipline.
Finally, the commission is mindful of the concerns over respondent’s return to the bench noted by the presiding judge in his testimony before the masters. The commission must fashion its order of discipline on the basis of the materials presented to it in the formal proceedings guided by the decisions of the Supreme Court and the commission’s prior decisions. The commission’s decision to publicly censure respondent is not a comment on the presiding judge’s past or future actions.
CONCLUSION
The commission orders that Judge W. Jackson Willoughby be censured for engaging in a pattern of inappropriate conduct in the workplace toward female court employees, and in particular for touching his bailiff’s breasts.
This decision shall constitute the order of public censure.
Commission members Judge Madeleine I. Flier, Ms. Gayle Gutierrez, Mr. Patrick M. Kelly, Mrs. Crystal Lui, Judge Rise Jones Pichon, and Ms. Ramona Ripston voted in favor of the public censure. Commission members Justice Daniel M. Hanlon, Mr. Michael A. Kahn, Ms. Lara Bergthold, and Mr. Mike Farrell favored the removal of Judge Willoughby from office. There is currently one public member vacancy.
Commission members Justice Hanlon, Michael Kahn, Lara Bergthold and Mike Farrell express the opinion that: It is only by removing judges who *CJP Supp. 166 behave as Judge Willoughby did that the commission can fulfill its duty to protect the public, enforce rigorous standards of judicial conduct, and maintain public confidence in the integrity of California’s judicial system. The commission’s prior decisions might suggest to some that a judge should remain on the bench even though he makes inappropriate and offensive remarks to female court employees and touches them without their consent (Fitch v. Commission on Judicial Performance), or that a judge should remain on the bench even though he makes sexually suggestive remarks to female staff members and sends a sexually suggestive postcard to a staff member, addressed to her at the office (In re Gordon). If conduct like Judge Willoughby’s can take place in a California courthouse in 1998, it is clear that forms of discipline less severe than removal will not protect the public or enforce rigorous standards of judicial conduct, or maintain public confidence in the integrity of the state’s judicial system. Only removal will reassure court employees that reporting conduct like Judge Willoughby’s is not a futile exercise. And only removal will reassure the public that California’s judges are held to an appropriate standard of conduct and that the state’s judiciary is worthy of the respect and trust that is required in a society governed by law.

 Respondent properly contends that the allegations concerning his former court clerk cannot be considered part of the pattern of inappropriate conduct because the pattern is alleged in the notice to have existed between November 1997 and June 1998, and the incidents concerning the former court clerk took place in 1996. Nonetheless, as the incidents were charged and fully litigated before the masters, the masters could properly consider the incidents in determining whether respondent had engaged in a subsequent pattern of inappropriate conduct.

 The commission voted unanimously to dismiss the allegations concerning the clerk.

 The commission voted unanimously to dismiss count two.

 California Constitution, article VI, section 18, subdivision (d); see also McCullough v. Commission on Judicial Performance (1989) 49 Cal.3d 186, 191 [260 Cal.Rptr. 557, 776 P.2d 259] (The Supreme Court reiterated that prejudicial conduct, although “less grave” than willful misconduct, “may nevertheless, by itself, justify removal.”); Geiler v. Commission on Judicial Qualifications, supra, 10 Cal.3d at page 284, footnote 11 (“It should be emphasized that our characterization of one ground for imposing discipline as more or less serious than the other does not imply that in a given case we would regard the ultimate sanction of removal as unjustified solely for ‘conduct prejudicial to the administration of justice which brings the judicial office into disrepute.’ ”).

 For example, in Dodds v. Commission on Judicial Performance, supra, 12 Cal.4th at page 172, the Supreme Court stated that a judge is “acting in his judicial capacity,” when he or she is performing a “judicial function,” i.e. “one of the varied functions generally associated with his position as a judge, whether adjudicative or administrative in nature.” The court stated that it gave weight to the location of a judge’s conduct and that “when a judge is in chambers during normal working hours, he is generally, though not necessarily, acting in a judicial capacity . . . .” (Ibid.) Nonetheless, the court disagreed with the commission’s finding that the judge’s failure to report that a fellow judge had let the air out of the tire of a van and his interference with the investigation constituted willful misconduct. The court noted that neither the witnessing of the event nor the interference with the investigation was a function generally associated with the position of judge, and stated that although the judge was “at the courthouse when he met with the detective, that location was simply a convenient meeting place.” (12 Cal.4th at p. 175.)
In Ryan v. Commission on Judicial Performance (1988) 45 Cal.3d 518 [247 Cal.Rptr. 378, 754 P.2d 724], the judge was found to have told offensive jokes to female attorneys in chambers on two separate occasions. The court stated that the judge was acting in his “official capacity” when he told a joke to two female attorneys who were in his chambers on a preliminary hearing, but noted in a footnote that it was unclear why the attorneys were present in chambers on the second occasion. (45 Cal.3d at p. 545.)
In Kennick v. Commission on Judicial Performance, supra, 50 Cal.3d 297, the court held that the judge’s attempt to have the highway patrolman misplace the paperwork on the judge’s driving under the influence arrest was not willful misconduct because the improper request did not take place when the judge was on the bench or in chambers (“took place wholly outside any judicial setting” (50 Cal.3d at p. 319)). The improper request may have constituted willful misconduct if it had been made in chambers, but it does not necessarily follow that every act in chambers is a judicial act.

 In addition to this conduct, Judge Geiler was found to have improperly and unlawfully relieved deputy public defenders from representing defendants in eight cases. The court severely criticized Judge Geiler’s treatment of the deputy public defenders. “Petitioner’s bad faith was directed towards our legal system itself .... It is this commitment to institutional justice which petitioner’s individual conduct threatens to corrupt. Risk of recurrence of such conduct cannot be tolerated.” (Geiler v. Commission on Judicial Qualifications, supra, 10 Cal.3d 270, 286.) Accordingly, it is not a certainty that the court would have removed Judge Geiler if he had only been charged with sexually offensive conduct.

 Justice Richardson would have called for further briefing and set the matter for oral argument in order that the court might consider imposition of a more severe sanction.

 The clerk (Ms. M_) also filed a sexual harassment suit against respondent, the county and the state. This suit was settled for $25,000. Respondent declined to participate in the settlement of the clerk’s action.

 The court noted “[i]n the final analysis Judge Gonzalez utterly fails to grasp either the substance or seriousness of the numerous charges levelled against him by the Commission. Despite multiple admonitions and the normal evidentiary limitations of the hearing process, Judge Gonzalez has treated this investigation as an attack on his character.” (Gonzalez v. Commission on Judicial Performance, supra, 33 Cal.3d at p. 377.)

 The comment to the deputy sheriff was made around April 1998. Both the bailiff and the clerk testified that respondent’s derogatory comment concerning the deputy district attorney was made in 1998. The portion of the second amended notice of formal proceedings concerning the derogatory comment is accordingly amended to conform to proof. (Rules of Com. on Jud. Performance, rule 128(a).)