*CJP Supp. 5 Opinion
McCONNELL, Chairperson.
I
INTRODUCTION AND SUMMARY
This disciplinary matter concerns Judge Richard W. Stanford, Jr., a judge of the Orange County Superior Court since 1998, and a judge of the Orange County Municipal Court from 1985 to 1998. The Commission on Judicial *CJP Supp. 6 Performance commenced this inquiry with the filing of its notice of formal proceedings (Notice) on April 7, 2011.
The Notice charges Judge Stanford with a pattern of diverting to his own court and acting on traffic tickets on behalf of his son-in-law, friends, and a juror over a seven-year period, between 2003 and 2010. It alleges that he improperly waived or suspended all or practically all fines and fees in eight cases and granted a continuance, outside of the ordinary course of business, in one case.
The Supreme Court appointed three special masters to hear and take evidence and report to the commission under commission rule 129. (All references to a rule are to the Rules of the Com. on Jud. Performance.) The masters are Hon. Maria P. Rivera, Associate Justice of the Court of Appeal, First Appellate District; Hon. Donald Cole Byrd, Judge of the Glenn Superior Court; and Hon. Jacqueline A. Connor, Judge of the Los Angeles Superior Court.
The masters held a three-day hearing commencing on July 25, 2011, followed by an oral argument on September 16, 2011. The masters’ report to the commission, containing their detailed findings of fact and conclusions of law, was filed with the commission on October 7, 2011. Judge Stanford appeared before the commission pursuant to rule 132 on December 7, 2011.
The masters concluded that Judge Stanford engaged in nine instances of willful misconduct over a seven-year period constituting a common practice of handling traffic tickets for friends and family. We reach the same conclusion, although we base our decision to remove Judge Stanford only on the seven instances of willful misconduct which occurred within six years of the start of the judge’s current term. (Cal. Const., art. VI, § 18, subd. (d).) This pattern of misconduct between 2005 and 2010 created both the appearance and the reality of a two-track system of justice—one for his friends and family and another for all others. Removal is necessary to restore public confidence in the integrity and impartiality of the judiciary and honor the commission’s mandate to ensure the evenhanded administration of justice.
Judge Stanford is represented by Paul S. Meyer, Esq., of Costa Mesa, California. The examiners for the commission are Gary W. Schons, Esq., and Valerie Marchant, Esq.
*CJP Supp. 7 II
FINDINGS OF FACT AND CONCLUSIONS OF LAW
A. Findings of Fact
The examiner has the burden of proving the charges by clear and convincing evidence. (Broadman v. Commission on Judicial Performance (1998) 18 Cal.4th 1079, 1090 [77 Cal.Rptr.2d 408, 959 P.2d 715] (Broadman).) Factual findings of the masters are entitled to special weight because the masters have “the advantage of observing the demeanor of the witnesses.” (Ibid.) “Nonetheless, the California Constitution vests in the Commission the power to impose judicial discipline, subject to review by the Supreme Court. Thus, the Commission may determine that it is appropriate to disregard the findings of fact and conclusions of law made by the special masters and make its own findings and conclusions.” (Inquiry Concerning Harris (2005) 49 Cal.4th CJP Supp. 61, 67; see Geiler v. Commission on Judicial Qualifications (1973) 10 Cal.3d 270, 275 [110 Cal.Rptr. 201, 515 P.2d 1].)
The masters found that each of the nine incidents of misconduct charged in the Notice was proven by clear and convincing evidence. We concur and adopt the masters’ findings of fact on the charges, and on the meeting with the presiding judge and subsequent events as stated below. Judge Stanford does not dispute these findings. The masters made certain other findings on matters not charged in the Notice concerning Judge Stanford’s state of mind. As discussed below, we reach our own independent factual findings on those issues based on Judge Stanford’s appearance before the commission and our review of the entire record of the hearing before the masters. Finally, we adopt the findings of the masters with respect to the judge’s contributions to the administration of justice and his community.
The Traffic Citation Process in Orange County Superior Court
After a person is cited for a moving traffic violation, law enforcement files the citation with the court. A standard courtesy notice is issued within days of the ticket being filed in court. The courtesy notice provides information about the fees and procedures for traffic tickets and lists the total bail amount (the base fine plus any applicable penalty assessments and relevant fees), as well as the traffic school fee if the person is eligible (which is the total bail amount plus an in-county traffic school fee). The courtesy notice also describes the procedure to follow to either pay the ticket or arrange for traffic school. Both can be accomplished without appearing at the courthouse by payment of the full bail amount and, if applicable, the traffic school fee.
*CJP Supp. 8 A person who does not want to pay the total bail amount can either make a personal appearance in traffic court or write in to request a reduction of the fines and fees, although these options are not explained in the courtesy notice. A person who wants to contest the ticket can either request a court trial or a trial by declaration.[1]
The Charges
1. Count 1(A): Pennell
In 2003, Judge Stanford was presiding over a criminal trial in which George Pennell was a juror. Pennell arrived late one day because he had been stopped and cited for speeding. Judge Stanford had emphasized to the jurors the importance of arriving on time. The judge testified, “I felt bad for the guy and here I am chewing on him. And in his mind, I’m the reason he got his traffic ticket to begin with, which is not really fair .... He’s doing his civic duty.” In open court, Judge Stanford offered to either suspend the fines or order traffic school with payment of only the county fee. Pennell chose traffic school.
Judge Stanford was assigned to a criminal felony department during this and all of the proceedings that are the subject of this inquiry. Traffic tickets are not handled in his department unless they are trailing a criminal proceeding that is set in his department. In this instance, Judge Stanford or his clerk (presumably at his direction) monitored the court’s records for the ticket. The judge directed that Pennell’s citation be transferred to his department when it entered the system in August 2003. He then directed his clerk to waive all fines except the traffic school fee of $51.50. According to Judge Stanford, the county traffic school fee is mandatory.
In September 2003, Pennell paid the county fee and was provided a traffic school notice. This is in contrast to a ticket he received in 2007, when he attended traffic school and paid the total bail amount of $305. The clerk who processed Pennell’s payment in 2003 did not recall ever seeing anyone else attending traffic school who paid only the county fee. Such a circumstance is “extremely rare and out of the ordinary.”
Although the minutes describe the proceeding as “Hearing Held for Arraignment,” there was no arraignment and Pennell did not appear.
*CJP Supp. 9 2. Count 1(B): Mooney
Mary Ann Mooney met Judge Stanford and his family when they were neighbors. They attended the same church. The judge’s wife socializes with Mooney’s daughter-in-law “somewhat.” Judge Stanford and Mooney’s son were fraternity brothers in college.
Mooney received a ticket in 2005 for impeding traffic. She was upset because she did not think she deserved the ticket. Judge Stanford learned about the ticket through someone other than Mooney, probably from his wife. The judge explained that he felt moved to assist Mooney, who was 82 years old at the time, because he believed she was frail and in ill health. Mooney’s family, however, stated Mooney was neither sick nor frail at the time and was generally very capable. Judge Stanford testified that she appeared frail to him when he saw and talked to her at church on Sundays. When asked why he did not advise Mooney to request a trial by declaration to avoid a trip to court, the judge simply answered he “didn’t think of it.” Judge Stanford conceded that he also was motivated to help her because she was upset about the ticket.
Judge Stanford could not recall if he communicated his offer of assistance to Mooney. The masters found, based on the totality of the testimony, that Judge Stanford handled the ticket based on hearsay information from his wife. We concur.
In December 2005, the ticket was transferred to Judge Stanford’s department. At the judge’s direction, his clerk entered a disposition of guilty with all fees and fines suspended. Mooney did not appear. The minutes state the court found “compelling and extraordinary circumstances” to waive the $20 security fee. There is not clear and convincing evidence that Judge Stanford made such a finding. Rather, the evidence establishes that it was entered by the clerk to effectuate Judge Stanford’s directive that no fines or fees be paid (certain fees cannot be waived without specific findings). Judge Stanford testified that it was possible he consented to the entry when he was told by his clerk that it was necessary. The clerk entered the disposition as “chambers work” because the judge’s notes came out of chambers for her to enter.
3. Count 1(C): Williams
Edwin Williams has been a pastor at Judge Stanford’s church since 2000. He and the judge are good friends. They see each other regularly at church services and in connection with the Good Samaritan Center, a church-run homeless ministry where Judge Stanford volunteers. They also play tennis together regularly at Judge Stanford’s home. Williams’s daughter held her wedding reception at the judge’s home.
*CJP Supp. 10 (a) The 2003 Ticket
In October 2003, Williams received a ticket for failing to stop at a red light. The total bail, excluding the traffic school fee, was $326. Williams discussed the ticket with Judge Stanford who told Williams he would suspend all the fines except the traffic school fee if Williams wanted to plead guilty. Judge Stanford explained that he offered his assistance because Williams was living on a pastor’s salary with four children and, “probably could use the money. Nothing specific ... He could have paid it. I just felt sympathy for him.”
In November 2003, a traffic clerk transferred the citation to Judge Stanford’s department for arraignment at the request of “a woman” on the telephone. The clerk described this as “very awkward” because Judge Stanford’s court was a felony department. Some days after the transfer, Judge Stanford’s clerk entered a disposition waiving all fines and fees except the $52 county traffic school fee.
(b) The 2006 Ticket[2]
In March 2006, Williams was cited for speeding, driving 54 mph in a 45 mph zone. He was upset because he thought the speed written on the ticket was different from what the officer had told him. Williams wanted to get the judge’s opinion regarding his chances of successfully contesting the ticket. When Williams raised the matter, the judge offered to take care of it. Williams could not recall what the judge said about how the ticket would be handled but, as a result of the 2003 experience, his sense was that the fines and fees would be waived. Williams believes he placed a copy of the ticket in the judge’s box at the church office.
A courtesy notice was sent to Williams indicating a total bail amount of $216 and a bail-plus-traffic-school-fee amount of $269.50. A week later, Judge Stanford ordered traffic school and waived all fines and fees except the $53.50 county traffic school fee. The clerk entered the disposition as “chambers work.” Williams did not appear in court.
The traffic clerk who processed Williams’s payment of the traffic school fee could not recall having ever seen another order for traffic school in which all fines and fees, other than the county traffic school fee, had been waived.
*CJP Supp. 11 4. Count 1(D): Gonzales
Gina Gonzales became Judge Stanford’s clerk in 1994. She considers the judge and his wife as friends and knows their children and their son-in-law. She has attended church teas with the judge’s wife and staff holiday lunches at the judge’s home.
In May 2006, Gonzales was cited for failure to stop at a stop sign. She was not eligible for traffic school because of a prior ticket. Gonzales was upset about the ticket because she believed she had stopped and because of the cost of the ticket. When she discussed the matter with Judge Stanford, he offered to suspend her fine if she was willing to plead guilty. Judge Stanford testified that he made the offer because he thought it would be awkward for Gonzales to go downstairs to traffic court, that she might need time off to go down there, and that “it would be easier for me to do it for her.”
The courtesy notice, sent in June, listed the total bail of $141. In August, Judge Stanford directed that a guilty plea be entered and all fines and fees suspended. Gonzales asked Jennifer Londo, a fill-in clerk, to enter the disposition because clerks are not permitted to enter minutes in their own case. Londo indicated that she did not interact with Judge Stanford about the matter but was given something in writing indicating the disposition to enter. Judge Stanford testified that he “must have” talked to Londo, or that he was “sure he would have” but he had no specific recollection of the conversation. The masters found there was no conversation between Judge Stanford and Londo. We concur.
Londo thought it would be “weird” to enter the matter as chambers work, so she entered it into the minutes as a “Hearing Held for Arraignment” and indicated that Gonzales had appeared and waived her rights. In fact, the judge never took the bench in this matter and there was no appearance or hearing.
5. Count 1(E): Neilson Construction
David Neilson is the owner of Neilson Construction and has been a friend of Judge Stanford for over 30 years.
In December 2006, the driver of a vehicle registered to Neilson Construction was cited for driving an overweight vehicle. The driver signed a promise to appear in court on or before January 31, 2007. Neilson contacted Judge Stanford about obtaining an extension of time to appear on the citation. He told the judge that the driver had not told him about the ticket until the day before the promise-to-appear date and that he was going to be out of town on *CJP Supp. 12 January 31. Judge Stanford offered to get an extension for Neilson. After getting the extension, Judge Stanford informed Neilson of the new date.
6. Count 1(F): Andrews
Heidi Andrews has known Judge Stanford for nearly 25 years and is a good Mend of the judge’s wife. In April 2007, Andrews was cited for speeding on the street where the Stanfords live while en route to visit the judge’s wife. Neither Andrews nor Judge Stanford could recall whether they spoke about the ticket. The masters found, as do we, that there was no such conversation. It is unclear how it was determined that Judge Stanford would handle Andrews’s ticket. Andrews testified, “it was just, for . . . lack of a better word, just sort of this is what happened, and it was able to be taken care of. And I thought, ‘Okay,’ and I didn’t think any more about it.” Judge Stanford testified that he wanted to help Andrews because the speed limit on his street had recently changed and he felt bad for her.
The standard courtesy notice was sent to Andrews on May 10, 2007. The total bail amount was $248.50. On May 17, Judge Stanford ordered entry of a guilty plea and suspended sentence, waiving all fees. The minutes state that Andrews “appeared via phone,” but neither the judge nor his clerk had any recollection of a telephonic appearance. Cherie Garofalo, the director of criminal operations (which includes traffic), could not recall ever seeing an appearance by telephone in a traffic matter. The masters found there was no telephonic appearance. We concur.
7. Count 1(G): Habbestad
Greg Habbestad knows Judge Stanford through the volunteer work they have done together at the Good Samaritan Center for more than 15 years. Habbestad attended annual barbecues for the ministry at the judge’s home and once attended a baseball game with him. He is an aerospace engineer at Boeing.
In September 2009, Habbestad received a citation for speeding, going 56 mph in a 40 mph zone. The courtesy notice was sent on November 2, indicating a total bail amount of $332. In November, the judge and Habbestad were working at Good Samaritan Center when other volunteers were having a conversation about traffic tickets. Habbestad mentioned he had received a ticket and expressed surprise about how expensive the fine was. After the center closed and the other volunteers had left, Judge Stanford told Habbestad that he would take care of the ticket so Habbestad did not have to go to court and could pay a lower fine.
Sometime later, Habbestad provided the judge with a copy of the courtesy notice. Judge Stanford thereafter directed his clerk to enter a disposition of *CJP Supp. 13 traffic school, with all fines and fees waived other than the $51 county traffic school fee. There was no appearance. The matter was entered in the minutes as “chambers work.” The minutes also included a finding of compelling and extraordinary circumstances for waiver of the assessment and security fees. The judge’s clerk testified that the entry was not made at the judge’s direction; rather, it was a code she entered in order to effectuate the judge’s directive to waive those fees.
Judge Stanford delivered the documentation to Habbestad who then went to court and paid the $51. The traffic clerk who took the payment does not recall ever seeing “someone get traffic school without any payment other than the county fee,” but she would not have questioned a disposition by a judge. Habbestad told his wife and other friends, including a police officer, that the judge helped him with the ticket.
8. Count 1(H): McGee
Michael McGee is Judge Stanford’s son-in-law; he is married to the judge’s daughter Laurie. In March 2010, McGee received a ticket for running a red light. McGee believed he had entered the intersection on a yellow light. He talked to his wife about getting Judge Stanford’s advice about whether he should fight the ticket. Laurie told McGee she would talk to her father or ask her mother to talk to her father. Laurie either left the ticket for her mother with a note or gave it to her mother. Laurie never spoke directly with her father about the ticket.
Sometime later, McGee and Judge Stanford had a conversation about the ticket. They discussed McGee’s options of either contesting the ticket or attending traffic school. At some point, Judge Stanford told McGee that he would process the ticket, but he would not be able to help him with future tickets. McGee does not remember the exact words used, but recalled the judge saying he would let McGee know if there was anything else McGee needed to do.
A courtesy notice was sent on April 12, indicating a total bail amount of $456, and a bail-plus-traffic-school-fee amount of $496. On May 3, Judge Stanford provided written directions for his clerk, Gonzales, to enter a disposition for traffic school with all fines suspended except for the county traffic school fee. When Gonzales recognized the defendant as the judge’s son-in-law, she went to the judge’s chambers and told him she could not enter minutes for someone she knew. She asked Judge Stanford whether he would like her to give it to her supervisor to assign to someone else to enter the minutes and the judge responded “yes.”
Gonzales gave the written disposition to her supervisor and explained that she could not enter it into the system because she knew the defendant. The *CJP Supp. 14 supervisor asked another clerk to enter the disposition. The supervisor also reported the matter to the deputy court operations manager who determined the clerk should not enter the disposition. Meanwhile, the clerk had independently declined to enter the disposition upon learning that McGee was the judge’s son-in-law and reported the interactions to the deputy court operations manager. At this point, the matter was referred to Judge Stanford’s superiors.
Meeting with Presiding Judge and Subsequent Handling of the McGee Ticket
When Presiding Judge Kim Dunning learned that Judge Stanford had attempted to enter a disposition in his son-in-law’s traffic matter, she arranged a meeting with him for the following morning. Prior to the meeting, Judge Dunning was provided with a list of traffic infractions handled by Judge Stanford, which included the dispositions at issue in this case. Some of the tickets where fines and fees had been waived were highlighted by staff, but the list was not accompanied by minutes or other information detailing the dispositions.
The meeting which took place in Judge Stanford’s chambers was attended by Judge Dunning, Assistant Presiding Judge Thomas B orris, and Judge Stanford. Judge Dunning told Judge Stanford “you can’t do this,” and explained the need for disqualification and the appearance of impropriety created by the judge’s conduct. Judge Stanford explained that he did not think it was unusual for a traffic defendant who came to court to have fines and fees reduced or eliminated. Judge Dunning responded that you “can’t handle cases for family members,” and further explained that traffic tickets are not as simple as they used to be, and that fiscal issues in 2010 have impacted the collection of fines and fees. During the meeting, Judge Stanford was “receptive and cooperative.” He was not defensive or argumentative, but appeared embarrassed and humiliated. It was Judge Dunning’s impression that Judge Stanford “missed the issue,” and that “a light bulb went on” during the meeting. Judge Stanford admitted his actions in the McGee matter and volunteered that he had taken similar actions in the past. Because of this admission, Judge Dunning did not show Judge Stanford the list of other traffic matters he had handled nor ask him about any of the cases on the list. Judge Stanford did not disclose that he had handled a ticket for his courtroom clerk, nor did he offer specifics about his assistance to other friends.
Judge Dunning informed Judge Stanford that she expected McGee’s ticket to be paid in full. Judge Dunning did not articulate how the matter should be resolved other than that there must be an immediate payment of the full fines and fees. She recalls Judge Stanford saying that he would write the check.
*CJP Supp. 15 After the meeting, Judge Stanford gave Barbara Bums, the deputy court operations manager, a personal check for $456, the total bail amount of McGee’s ticket, and the “Court Information Sheet” (CIS) for the ticket. Despite having been counseled about the impropriety of entering a disposition in his son-in-law’s case, Judge Stanford crossed out the earlier disposition on the CIS and wrote instead: “T.S. Fines & fees pd Today $456, sign & pay TS fee by 5/28/10. RWS.” He asked Bums to enter the new disposition. A traffic clerk subsequently entered the payment and the indicated extension of time to pay the traffic school fee. Bums gave Judge Stanford a receipt and a document which reflected the extension. The judge did not inform McGee of the disposition of his ticket or of the May 28 deadline to pay the county traffic school fee.
Judge Dunning testified that she did not expect Judge Stanford to order a disposition in his son-in-law’s matter after their meeting. She decided at the meeting that the ticket had to be handled by someone else. However, she went on to state, “I have to take responsibility for this because I didn’t articulate [how the matter was to be handled].”
Judge Stanford’s State of Mind
1. Did Judge Stanford know his conduct was wrong at the time he acted?
Judge Stanford testified that when he was adjudicating the tickets of friends and family it did not occur to him that his actions were improper, that he simply “missed” the conflicts and appearance issues, and had a “blind spot” which prevented him from thinking about the impropriety of his actions. Consciousness of wrongdoing is not charged in the Notice and is not an element of willful misconduct in the context of this case. Nevertheless, the judge urged the masters to find that he did not realize his actions were unethical until he was confronted by the presiding judge. While recognizing “[t]hat a seasoned judge would miss the issue does seem implausible,” the masters were “not persuaded that he [(Judge Stanford)] could not have failed to recognize the conflict of interest and the appearance of impropriety it created. Many who have known Judge Stanford for years have testified that, yes, he could have—and did—miss the issue. We cannot simply disregard this mass of evidence as ‘wishful thinking’ and conclude it was not possible.” (Original italics.) We respectfully decline to adopt this finding and, instead, find that Judge Stanford recognized the impropriety of his conduct when he provided preferential treatment to friends and his son-in-law in traffic matters.
As the masters note, numerous fellow jurists testified and submitted letters attesting to Judge Stanford’s integrity and opining that he would not have *CJP Supp. 16 handled the tickets of friends and family if he had known it was wrong. During her meeting with Judge Stanford, Judge Dunning was of the impression that the judge had “missed” the issue, and that “a light bulb” had gone on when confronted with the impropriety of his conduct. It is not surprising that those who know and respect Judge Stanford would have difficulty reconciling their view of the judge’s integrity with his having knowingly engaged in unethical conduct. However, even if the judge’s misconduct was an aberration or motivated by his proclivity to help others, we find it implausible that Judge Stanford was entirely unconscious of the impropriety of his actions when he handled the traffic tickets of family and friends.
Judge Stanford’s 26 years on the bench, long career as a prosecutor, and reputation as a “by-the-book” judge who does not “cut corners” and is knowledgeable, diligent and follows the law negates any possibility that he missed the issue. Fellow judges to whom the question was posed on cross-examination acknowledged that they would not have missed the issue. Many of those who submitted letters and testified as to the judge’s good character acknowledged the apparent impropriety and gravity of the judge’s conduct (“disturbing,” “serious breach of ethical duties,” “shocks and disappoints me,” “indefensible”).
Significantly, Gina Gonzales, the judge’s clerk, did not “miss the issue” when asked to enter the disposition for Judge Stanford’s son-in-law. She knew immediately that she could not handle a case involving someone she knew and told the judge so. Yet, according to Judge Stanford, even this did not alert him to the impropriety of handling his son-in-law’s ticket.
Members of the public know instinctively that a judge should not handle traffic tickets of family and friends. We have previously noted that common experience and common sense indicate that “ ‘ticket fixing is a quintessential bad act of a judge. It is an abuse of power that citizens unquestionably understand and are suspicious about.’ ” (Inquiry Concerning Platt (2002) 48 Cal.4th CJP Supp. 227, 233 (Platt).) Judge Platt was charged with instructing his clerk in four cases to transfer to his court a speeding ticket issued to a friend or relative of a friend or acquaintance, and then dismissing the ticket without an appearance. The judge testified that, although he later realized that dismissing the tickets was wrong, he did not perceive any legal or ethical problem at the time he handled the tickets. The masters concluded that Judge Platt’s explanation for dismissing the ticket and his claim that he did not realize at the time his action was wrong were “ ‘after-the-fact rationalizations which lack credibility.’ ” Citing Judge Platt’s reputation as a careful decision maker with a good knowledge of the law, the commission concurred with the masters’ finding that “ ‘it is inconceivable he did not know the obvious, that ticket fixing was wrong ....’” (Ibid.) Judge Platt was removed from office.
*CJP Supp. 17 The impropriety of adjudicating the traffic tickets of friends and family is no less transparent when fines and fees are waived than when the ticket is dismissed. (Inquiry Concerning Wasilenko (2005) 49 Cal.4th CJP Supp. 26, 49-50, 51 (Wasilenko).) As we stated in Wasilenko, the vice in a two-track system of justice does not turn on whether there was a classic ticket “fix” in the sense of a dismissal of a ticket, “but rather, in the damage to the reputation of the judiciary from the double standard.” (Id. at p. 49.)
We are mindful that the masters found Judge Stanford to be a credible witness and that the factual findings of the masters are entitled to special weight. However, this commission retains the authority to override the factual findings of the special masters, even on matters of credibility. (See, e.g., Broadman, supra, 18 Cal.4th at p. 1090.) In this case, commission members had the opportunity to question Judge Stanford extensively concerning his state of mind and observe his demeanor at his appearance before the commission. The judge acknowledged that he has attended judicial ethics education programs and has looked at summaries of cases involving ticket fixing. Yet, he was unable to offer any introspection as to how he could have missed the obvious. When asked why he handled tickets for friends and family, he responded, “In an effort to help people that I knew in situations that, at the time, seemed like an appropriate thing to do, to help the individuals.” We simply do not believe that Judge Stanford failed to recognize the impropriety of using the power of his judicial office to help his son-in-law and his friends.
When asked if he would have recused if his son-in-law had a case assigned to his courtroom, Judge Stanford stated that the issue would have been obvious in open court with “people standing in front of you.” We believe the issue was just as obvious to Judge Stanford in the cases before us, but that his failure to recuse was easier to conceal when people were not standing in front of him. While insisting that he was oblivious to the impropriety of his actions, Judge Stanford acknowledged that he agreed with his character witnesses who testified that the issue was so obvious they did not see how anybody would miss it. Judge Stanford did not miss the issue, he ignored the issue.
2. Was it reasonable to believe that suspension of all fees and fines was a common practice in traffic court?[3]
Judge Stanford testified he believed that waiving or suspending all fees and fines was a regular practice in traffic court. His understanding was based on *CJP Supp. 18 his own experience in occasionally covering traffic court and night court 15 to 20 years ago. He testified he also based his belief about standard traffic dispositions on occasional conversations with traffic commissioners; however, he could not provide any specifics about those conversations. The judge admitted he did not make inquiries about the current practices in traffic court at the time he was adjudicating the tickets at issue. The masters found “that the judge’s belief he was acting within the mainstream of traffic citation outcomes, while falling below professional standards—possibly, a violation of Canon 3B(2)—was not unreasonable.” We reach a different conclusion based on our independent review of the record.
In fact, during the period of the subject tickets, waiver or suspension of all fines and fees was an unusually lenient disposition in traffic court. Orange County Superior Court judges who were familiar with traffic court testified that a judge or commissioner would commonly reduce fees and fines in traffic court, but a complete waiver of fines and fees was not common and was “the exception to the rule.” Presiding Judge Dunning testified that traffic fees are not as simple as they used to be and that fiscal issues in recent years have impacted collection of fees and fines.[4] Further, she testified that Judge Stanford “was not really current on what the traffic ticket situation was.”
The examiner introduced a random sample of two weeks of traffic dispositions in 2009 and 2010 for the same violations as those handled by the judge in this case (with the exception of impeding traffic). None of the dispositions included a full waiver of fees and fines.[5]
The director of criminal operations in Orange County Superior Court testified that in her experience as a traffic court clerk she frequently saw fines and fees reduced but infrequently, less than a few times per month, saw a waiver of all fines and fees except for the traffic school fee. Other traffic department clerks made similar observations [(full waiver other than traffic school fee was “extremely rare and out of the ordinary,” saw similar dispositions “never” or “every once in a while”)].
Based on this evidence, we conclude Judge Stanford had no reasonable basis for believing his family and friends would have received the same *CJP Supp. 19 outcome had they appeared in traffic court. Having handled criminal courts for years, Judge Stanford knows that sentences and fees and fines change over time, yet he never bothered to inquire whether sentencing practices in traffic court had changed in the last 15 to 20 years. Moreover, it has never been proper to waive fees and fines in traffic court for no reason or to benefit friends and family. As noted by the masters, “judges should not issue orders in any cases where they are unfamiliar with the legal standards (Canon 3B(2)).” Wearing blinders may have provided Judge Stanford with a rationalization for his conduct, but it did not render his unfounded belief that he was acting within the mainstream of traffic citation dispositions reasonable.
The Judge’s Contributions to the Judiciary and His Community
Much of the evidence Judge Stanford presented at the hearing before the masters related to his reputation within the judicial and legal community and his significant charitable contributions outside of court. Judge Stanford understands that mitigating evidence is not relevant in determining if he acted in bad faith, and thus engaged in willful misconduct, but may be taken into account in determining the totality of the circumstances as pertinent to determining the appropriate discipline. (Inquiry Concerning MacEachern (2008) 49 Cal.4th CJP Supp. 289, 312 (MacEachern); Broadman, supra, 18 Cal.4th at p. 1112.)
Fellow judges, lawyers, friends, relatives, members of the community, and law enforcement associations testified or submitted letters on Judge Stanford’s behalf. The masters state, “By far the greatest outpouring of support for Judge Stanford relates to his 26 years of ethical, fair and honorable service on the bench and the value of his contributions to the Orange County Superior Court.” Judge Stanford is described as “zealously fair,” well prepared, honorable, “rock solid” and humble. He is known to be one of the hardest working judges on the Orange County bench. Based on this evidence, the masters found that Judge Stanford is a widely respected jurist. We adopt this finding.
The masters also found “that both the nature and quantity of Judge Stanford’s community service is extraordinary.” We agree. He is an active member in the First Free Evangelical Church, where he serves as an elder. Judge Stanford volunteers at the church’s program for the homeless, the Good Samaritan Center, five days a week. As the administrator of the center, he spends 300 hours per year personally managing the program. In addition to donating his time to the center and other charitable organizations, the judge assists a woman, who was blinded by battery acid in a vicious attack, by driving her to church on Sundays, bringing her food, and helping her with *CJP Supp. 20 home maintenance. The judge and his wife spend one week of their vacation every year at a camp for foster children.
B. Conclusions of Law
The masters concluded and Judge Stanford concedes that he engaged in nine incidents of willful misconduct. We reach the same conclusion.
Willful misconduct is the most serious type of judicial misconduct. “The use of the power of judicial office to benefit a friend is a ‘casebook example of wil[l]ful misconduct.’ ” (Wasilenko, supra, 49 Cal.4th CJP Supp. at p. 46, quoting McCullough v. Commission on Judicial Performance (1989) 49 Cal.3d 186, 194 [260 Cal.Rptr. 557, 776 P.2d 259].) It is defined by the California Supreme Court as consisting of (1) unjudicial conduct that is (2) committed in bad faith (3) by a judge acting in his judicial capacity. (Broadman, supra, 18 Cal.4th at p. 1091.)

Unjudicial Conduct

Failure to comply with the canons of the California Code of Judicial Ethics (all references to a canon are to the California Code of Judicial Ethics) is generally considered to constitute unjudicial conduct. (Adams v. Commission on Judicial Performance (1994) 8 Cal.4th 630, 662 [34 Cal.Rptr.2d 641, 882 P.2d 358].) The masters concluded, as do we, that Judge Stanford’s conduct violated canons 1 (a judge shall uphold the integrity and independence of the judiciary); 2A (a judge shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary and shall avoid the appearance of impropriety); 2B(1) (a judge shall not allow family, social or other relationships to influence the judge’s judicial conduct or judgment, nor shall a judge convey or permit others to convey the impression that any individual is in a special position to influence the judge);[6] 3B(7) (a judge shall not initiate, permit or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties in a pending or impending proceeding); 3E(1) (a judge shall disqualify himself in any proceeding in which disqualification is required by *CJP Supp. 21 law);[7] and 3E(2) (a judge shall disclose on the record information that is reasonably relevant to the question of disqualification).[8]
The masters expound upon the manifest violation of the canons which require a judge to uphold the integrity and independence of the judiciary and avoid the appearance of impropriety and favoritism (canons 1, 2, 2A, 2B(1)): “As noted in the commentary to Canon 1, ‘the integrity and independence of judges depend in turn upon their acting without fear or favor.' [(Italics added.)] Judge Stanford’s special attention was conferred only on a favored few . .. and the integrity of the judicial office was thereby seriously impaired. These are precisely the kinds of actions that undermine public confidence in the judiciary, and call into question the fundamental fairness of the judicial process, a clear violation of Canons 1, 2 and 2A. In taking irregular actions to assist friends and family Judge Stanford abused his power, allowed his special relationships to influence his judicial conduct, and conveyed the impression that such persons were in a position to influence him, in violation of Canon 2 and 2B(1).” We agree.
With respect to canon 3B(7), the masters concluded that Judge Stanford engaged in ex parte communications with the individuals who received the traffic tickets. The masters considered these violations to be “particularly egregious because the communications took place, in almost every instance, outside of the courtroom. Gathering information about pending matters by telephone, in the home [McGee], at church [Williams] or at a homeless ministry [Habbestad] as well as through intermediaries [Andrews, Mooney], is an unacceptable departure from judicial norms even apart from the judge’s ill-advised decision to personally handle the matters.” We agree. We part from the masters, however, on the issue of whether the judge failed to accord the district attorney the right to be heard. (Canon 3B(7).) In addition to prohibiting ex parte communications, canon 3B(7) requires a judge to accord to every person who has a legal interest in a proceeding, or the person’s lawyer, a full right to be heard according to law. The masters concluded that Judge Stanford did not violate this portion of the canon because the Orange County District Attorney’s Office had a policy of not appearing in traffic court.
*CJP Supp. 22 The Orange County District Attorney’s Office has not appeared on traffic infractions for many years because of limited resources. The judge and the examiner stipulated: “The DA’s non-appearance policy assumes that the ticket is in traffic court, or otherwise legitimately before the judge. The DA’s implied consent to ex parte communications with pro per traffic ticket defendants only exists to the extent that the tickets are being heard in the ordinary course of judicial business. The DA’s non-appearance policy does not extend to tickets that are not legitimately pending before the judge.”
We addressed this issue in Wasilenko, supra, 49 Cal.4th CJP Supp. at pages 44-45. Judge Wasilenko was charged with entering dispositions on traffic tickets of friends and relatives after transferring the matters to his own department. The Yuba County District Attorney had a policy of not appearing in traffic court. The masters in that case also concluded that canon 3B(7) was not violated as to district attorneys because the district attorney’s office implicitly consented to ex parte communications in traffic court. The commission declined to make any findings or conclusions on this issue because the record was silent as to whether the district attorney’s implied consent to ex parte communications in Yuba County included communications in matters that are not legitimately before the judge. (Wasilenko, supra, 49 Cal.4th CJP Supp. 26, 29-30.) However, we noted that even in those cases in which the judge is hearing traffic cases within the normal course of business, the judge “ ‘must be most circumspect in avoiding an appearance of lack of impartiality.’ ” (Id. at p. 45, quoting People v. Marcroft (1992) 6 Cal.App.4th Supp. 1, 4 [8 Cal.Rptr.2d 544].) “ ‘The very absence of a prosecuting attorney makes it all the more important that the court at such trials use the utmost care to preserve not only the reality but also the appearance of fairness and lack of bias.’ ” (Ibid.)
In this case, the evidence establishes that the district attorney’s nonappearance policy is limited to matters that are legitimately before the judge. The masters note there was no evidence that Judge Stanford was aware of this limitation on the policy. Even so, Judge Stanford should have realized that the district attorney’s nonappearance policy was limited to cases being handled by a judge without a conflict in the normal course of business. Moreover, we do not think it necessary for district attorneys to specifically advise judicial officers that they are not consenting to communications with litigants that by definition are improper, e.g., out of court at a judge’s house, or through an intermediary. Thus, we conclude Judge Stanford failed to accord the district attorney the right to be heard in violation of canon 3B(7).

Bad Faith

The second element of willful misconduct is bad faith. A judge acts in bad faith “only by (1) performing a judicial act for a corrupt purpose *CJP Supp. 23 (which is any purpose other than the faithful discharge of judicial duties), or (2) performing a judicial act with knowledge that the act is beyond the judge’s lawful judicial power, or (3) performing a judicial act that exceeds the judge’s lawful power with a conscious disregard for the limits of the judge’s authority.” (Broadman, supra, 18 Cal.4th at p. 1092.) The masters concluded, as do we, that Judge Stanford acted in bad faith under the first definition because he acted for a purpose other than the faithful discharge of judicial duties—to benefit friends and family.

Judicial Capacity

As to the third element of willful misconduct, Judge Stanford was acting in a judicial capacity because he was performing a function associated with the position of a judge—entering pleas, imposing sentence and granting a continuance. (Broadman, supra, 18 Cal.4th at p. 1104.)
III
DISCIPLINE
Judge Stanford has engaged in a pattern of willful misconduct involving the abuse of judicial authority to benefit family and friends—one of the most egregious types of judicial misconduct. Such conduct affronts the very essence of a fair and impartial judiciary.
The California Constitution provides that a judge may be censured or removed for willful misconduct occurring not more than six years before the start of his or her current term. (Cal. Const., art. VI, § 18, subd. (d).) The judge’s handling of juror Pennell’s ticket and Williams’s 2003 ticket fall outside of this constitutional time limitation. Therefore, we do not consider those incidents in reaching our disciplinary decision. Setting those incidents aside, Judge Stanford has engaged in seven incidents of willful misconduct over a period of nearly five years.
Determining the appropriate discipline “depends in large measure on the nature and number of charges found to be true.” (Furey v. Commission on Judicial Performance (1987) 43 Cal.3d 1297, 1307, fn. 2 [240 Cal.Rptr. 859, 743 P.2d 919].) The number of acts of misconduct is relevant to discipline to the extent it shows isolated incidents, or a pattern that demonstrates that the judge lacks judicial temperament and the “ ‘ “ability to perform judicial functions in an even-handed manner.” ’ ” (Fletcher v. Commission on Judicial Performance (1998) 19 Cal.4th 865, 918 [81 Cal.Rptr.2d 58, 968 P.2d 958].) The masters concluded, and we agree, that these were not isolated incidents. Rather, the evidence establishes a common practice of diverting the traffic *CJP Supp. 24 tickets of friends and family to his court and, in all but one case, waiving or suspending all or most fines and fees.[9] Such conduct manifestly demonstrates an inability to perform judicial functions in an evenhanded manner. As stated in Wasilenko: “[T]he gravamen of the wrongdoing is the two-track system of justice—one for those with special access to the judge, and the other for everyone else. The nub of the problem is the appearance or reality that Lady Justice is not blindfolded. Rather than justice being dispensed with an even hand without regard to who is before the court, the judge has lifted the blindfold, and seeing a relative or friend or some person with influence, the judge tips the scale and puts them on a special track for favored handling. This is corruption at the core of our system of impartial equal justice, and is intolerable.” (Wasilenko, supra, 49 Cal.4th CJP Supp. at p. 51.)
In six of the seven instances of misconduct on which we base our disciplinary decision, Judge Stanford provided substantial financial breaks to the favored few. As previously discussed, despite the judge’s “understanding” to the contrary, waiver or suspension of all or most fees and fines was not a common practice. Most, if not all, of those who benefitted from the judge’s assistance did not have a financial hardship that might have resulted in a reduction of fees and fines had they come to traffic court. Rather, they were given virtually a free ride because of their close relationship to Judge Stanford.
Judge Stanford’s conduct was wrong on many levels. Not only did he favor those he knew with procedural shortcuts and extraordinarily lenient dispositions, he repeatedly engaged in ex parte communications, entered dispositions based on hearsay information from his wife, failed to recuse when there were obvious conflicts of interest, handled matters not assigned to his court, and waived fees and fines without considering the facts of the offense, the driver’s record, or public safety.[10] The commission has previously recognized the gravity of this type of misconduct by imposing the maximum discipline on judges who engaged in a pattern of providing preferential treatment to family and friends in the adjudication of traffic matters. (Wasilenko, supra, 49 Cal.4th CJP Supp. 26; Platt, supra, 48 Cal.4th CJP Supp. 227; Censure and Bar of Judge Danser (2005); Censure and Bar of Judge Simpson (2002).)
Our decision to remove Judge Stanford is based not only on the nature and extent of the misconduct but on the consideration of other factors previously *CJP Supp. 25 identified by the Supreme Court and this commission as relevant to determining the appropriate level of discipline. First and foremost in our consideration of the case before us is the impact of Judge Stanford’s conduct on the judicial system. (See, e.g., Inquiry Concerning Van Voorhis (2003) 48 Cal.4th CJP Supp. 257, 314 [impact of misconduct on judicial system a factor to consider in determining appropriate level of discipline].) By granting special treatment to friends and family, Judge Stanford engaged in conduct that subverts the impartiality of the judicial system and undermines respect for the judiciary as a whole. In the public’s eye, ticket fixing is the quintessential bad act of a judge. We doubt citizens consider the waiving of fines for the preferential few to be any less repellant than the outright dismissal of tickets. The masters conclude their report by observing that this case “is a stark reminder that we each hold in our hands, every day, the power to preserve or to tarnish the integrity of the judicial branch.” Unfortunately, Judge Stanford used his judicial power in a manner that gravely tarnished the integrity of the judicial system.
The judge’s misconduct also had an adverse impact on court staff. In order to transfer matters to his department, and effectuate and process his dispositions, Judge Stanford directly involved at least four members of court staff. In the matter involving the judge’s son-in-law, the clerk who was asked to enter the disposition after Gonzales declined was put in the uncomfortable position of reporting the interactions to her manager. Further, the misconduct resulted in the creation of false court records. Because Judge Stanford’s dispositions were made out of the ordinary course of business, clerks were uncertain how to reflect the dispositions in the minutes resulting in inaccurate entries— appearances where there were none, findings that were not made or supported (“compelling and extraordinary circumstances” for waiver of a mandatory security fee), arraignments and pleas that did not occur. While helping friends and family, the judge’s conduct had an adverse ripple effect on those within the court system and led to the entry of false records. Judge Stanford’s failure to realize that his actions could have serious consequences for others within the court system aggravates rather than mitigates his misconduct.
Another factor we consider in determining the appropriate discipline is whether the judge’s conduct and his response to the commission’s inquiry reflect a lack of integrity or dishonesty. (MacEachern, supra, 49 Cal.4th CJP Supp. at p. 306; Inquiry Concerning Hall (2006) 49 Cal.4th CJP Supp. 146, 171; Adams v. Commission on Judicial Performance (1995) 10 Cal.4th 866, 914 [42 Cal.Rptr.2d 606, 897 P.2d 544]; Kloepfer v. Commission on Judicial Performance (1989) 49 Cal.3d 826, 865 [264 Cal.Rptr. 100, 782 P.2d 239].) While we do not doubt that Judge Stanford has a reputation as a person of *CJP Supp. 26 honesty and integrity among those who provided character evidence on his behalf, his conduct in this case unquestionably demonstrates a lack of integrity. Additionally, the judge has not been honest with the special masters or the commission about his state of mind. (See MacEachern, supra, 49 Cal.4th CJP Supp. at p. 309.)
We also consider whether a judge appreciates the impropriety of his actions as being indicative of a capacity to reform. (E.g., Platt, supra, 48 Cal.4th CJP Supp. at p. 248.) Judge Stanford contends this factor weighs against removal because, in the words of the masters, “the evidence presented overwhelmingly supports a finding that Judge Stanford has been remorseful and contrite, that he immediately accepted full responsibility for his actions, and that he can be expected never to engage in this kind of misconduct in the future.” (Italics added.) We agree that since being confronted with his transgressions, Judge Stanford has been contrite and humble. However, we do not agree that he has accepted full responsibility for his actions. Indeed, he has admitted that he engaged in the acts charged and that those acts constitute misconduct—facts and conclusions that would be difficult to refute. However, he claims he did not recognize that what he was doing was wrong. In other words, he insists that he was acting in good faith. This does not demonstrate a true appreciation of the misconduct; rather, it reflects an effort to minimize his culpability.
Even if Judge Stanford can be expected not to engage in this type of misconduct in the future, we are not convinced that he would not engage in other types of misconduct. The judge’s failure to consider the impact of his misconduct on his court staff and the reputation of the judiciary at the time of his actions leaves us with little confidence in his ability to refrain from future misconduct demeaning to the esteem of the judiciary. Moreover, the fact that he personally changed the adjudication on his son-in-law’s ticket despite having been counseled by his presiding judge about the obvious conflict raises concerns about his ability to refrain from future misconduct.
Judge Stanford attempts to focus the question of discipline on his state of mind at the time he handled the tickets. He contends that removal is not warranted absent proof of a consciousness of wrongdoing. As previously discussed, we find clear and convincing evidence Judge Stanford knew that providing preferential treatment to friends and relatives was wrong at the time he handled each of the tickets in this case. Nonetheless, we address this issue because it has been the crux of the judge’s defense to the charges. We agree with the masters that the judge’s state of mind is not the determining *CJP Supp. 27 factor on the issue of discipline because a failure to recognize the impropriety of such obviously unethical conduct “necessarily raises the correlated concern that he may continue to ‘miss’ other such issues in the future.” Moreover, we have never said proof of a corrupt state of mind is a prerequisite to removal. (See Inquiry Concerning Van Voorhis, supra, 48 Cal.4th CJP Supp. 257, 314.) The Supreme Court and this commission have repeatedly stated that the prnpose of commission judicial discipline proceedings is not to punish the judge, but rather “the protection of the public, the enforcement of rigorous standards of judicial conduct, and the maintenance of public confidence in the integrity and independence of the judicial system.” (Adams v. Commission on Judicial Performance, supra, 10 Cal.4th at p. 912; see MacEachern, supra, 49 Cal.4th CJP Supp. at p. 306.) As in this case, adherence to these objectives may require removal regardless of the judge’s state of mind. The public deserves protection from judges who commit serious misconduct regardless of whether the conduct is the result of malice or ignorance.
Finally, we have not ignored Judge Stanford’s exceptional contributions to his court and his community or the fact that his prior discipline over a long tenure on the bench is limited to one advisory letter.[11] These facts, however, are eclipsed by a pattern of misconduct in which Judge Stanford repeatedly abused the power of his judicial office by providing benefits to the favored few not available to other citizens.
In the end, after consideration of the foregoing guiding factors, we have determined that removal is necessary to assure the public that a two-track system of justice and the dispensation of special favors by judges have no place in this state. As we previously explained with respect to a similar pattern of misconduct: “It is our duty to denounce the misconduct in no uncertain terms and to sanction it as the grave ethical violation that it is, in our best effort to ensure evenhanded justice, starting at the very point of access to the judge.” (Wasilenko, supra, 49 Cal.4th CJP Supp. at p. 51.) We remove Judge Stanford from office in order to fulfill our mandate to protect the public, enforce rigorous standards of judicial conduct, and maintain public confidence in the integrity of the judiciary and the evenhanded administration of justice.
ORDER
This decision shall constitute the order of removal of Judge Richard W. Stanford, Jr., pursuant to the provisions of article VI, section 18 of the California Constitution.
*CJP Supp. 28 Commission members Hon. Judith D. McConnell, Ms. Mary Lou Aranguren, Anthony Capozzi, Esq., Nancy E. Nishimura, Esq., Mr. Lawrence Simi, Ms. Maya Dillard Smith, Ms. Sandra Talcott, Mr. Adam Torres, Mr. Nathaniel Trives, and Hon. Erica R. Yew voted to remove Judge Stanford from office and in favor of all of the findings and conclusions expressed herein. Commission member Hon. Frederick P. Horn was recused.

 The findings in this paragraph were not included in the masters’ report. They are supported by clear and convincing evidence presented at the hearing, particularly the testimony of Cherie Garofalo, the director for criminal operations (including traffic) in Orange County Superior Court.

 In 2005 Williams received a speeding ticket. He did not discuss that ticket with Judge Stanford and paid the fine of $178.50.

 In our discussion of this issue, we exclude Judge Stanford’s action on the Neilson ticket which involved only an extension of time to appear—something Neilson could have obtained in the ordinary course of business.

 The only time fees and fines are routinely waived is when a felony defendant is being sentenced to state prison. In that case, pending traffic tickets are often transferred to the felony department so they can be disposed of by way of dismissal or waiver of fines and fees pursuant to a felony plea bargain or at felony sentencing.

 Further, the masters accepted the examiner’s representation that there were no dispositions where traffic school was ordered for only the county fee in a compendium of five random-sample weeks of dispositions for the same traffic offenses as those involved in these matters during the years 2003 to 2008. Judge Stanford does not object to this finding.

 The Notice charges Judge Stanford with violating canon 2B(2) which provides that a judge “shall not lend the prestige of judicial office or use the judicial title in any manner, including any oral or written communication, to advance the pecuniary or personal interests of the judge or others,” except under specified circumstances (e.g., letter of recommendation based on personal knowledge). The masters concluded that this canon was not violated because the “gravamen of this canon is to prohibit the judge’s use of his or her title or prestige to influence others to act in a manner that advances the interests of the judge or others.” (Original italics.) They point out that all of the exceptions in the canon involve the judge offering testimony or communications to third parties. We agree that in the context of this case canon 2B(2) was not violated.

 A judge’s obligation to disqualify from matters involving family members and close friends is undisputed. (See Code Civ. Proc., § 170.1, subd. (a)(1), (4), (6)(A)(iii).)

 The masters concluded that the disqualification and disclosure canons were not violated with respect to the Pennell matter. Disqualification was not required, the masters concluded, because the judge’s only relationship with Pennell was that he had served as a juror in the judge’s courtroom. While disclosure was required, the masters concluded the record demonstrates that the judge discussed and disclosed the relevant facts in open court. We adopt this conclusion.

 The masters found a pattern of misconduct based on nine incidents of misconduct. We conclude that the seven incidents of misconduct that occurred within six years of the start of the judge’s current term constitute a pattern of willful misconduct.

 When Williams received his 2006 ticket for speeding, he had three children in the car. He had previously received a speeding ticket in 2005 and a ticket in 2003 for failing to stop at a red light.

 Judge Stanford received an advisory letter in 2005 disapproving of the manner in which he issued orders continuing the detention of a material witness.